563 F.2d 836
 UNITED STATES of America, Plaintiff-Appellee,
v.
John J. NERONE, a/k/a "J.J.," Victor Joseph Seppi, a/k/a
"Vic," MarvinMartin Hornstein, a/k/a "Pete," Leonard Vieth,
Arthur Gentry, Donald LeeHornstein, Donald K. Bradley, a/k/a
"Moose," Wilbur Y. Caples, a/k/a"Butch," LaverneJamerson,
Reubin Helfer, Larron Joe Schellinger, a/k/a "Jo-Jo," and
DominicJoseph Greco, Sr., Defendants-Appellants.
 Nos. 76-2181 76-2189.
 United States Court of Appeals,
Seventh Circuit.
 Argued June 15, 1977.
Decided Sept. 29, 1977.
 
 John J. Casey, Springfield, Ill., Charles A. Bellows, Chicago, Ill., Charles J. Gramlich, Walter H. Kasten, Springfield, Ill., Gerald M. Werksman, Chicago, Ill., Grady E. Holley, Thomas F. Londrigan, Springfield, Ill., Giles A. Franklin, Chicago, Ill., for defendants-appellants.
 Michael W. Farrell, Paul J. Brysh, Attys., U. S. Dept. of Justice, Washington, D. C., Gerald D. Fines, U. S. Atty., Elijah Richardson, Asst. U. S. Atty., Springfield, Ill., T. George Gilinsky, Washington, D. C., J. Kenneth Lowrie, Dept. of Justice, Chicago Strike Force, Chicago, Ill., for plaintiff-appellee.
 Before FAIRCHILD, Chief Judge, and PELL and BAUER, Circuit Judges.
 PELL, Circuit Judge.
 
 
 1
 On September 24, 1975, a seven-count indictment was returned in the Southern District of Illinois, charging thirteen[1] individuals with violations of the federal statutes relating to illegal gambling and racketeering. The twelve appellants have filed timely notices of appeal from final judgments of convictions on Counts I, II, III, VI and VII of the indictment. These consolidated appeals present for review approximately fourteen issues, demonstrating once again the direct relationship between the proliferation of parties and issues in a conspiracy case.
 
 
 2
 The factual and procedural context of these appeals is both complicated and subtle. No useful purpose will be served by setting forth factual details which are germane only to issues which our disposition of the case eliminates from formal consideration. Accordingly, this opinion will refer only to those facts pertinent to our adjudication of the case.
 
 
 3
 Additionally, we must note that the Government and several appellants have interpreted the conspiracy count of the indictment as charging an offense which in its literal language it does not clearly state. Our summation of the indictment will set forth the theory of the indictment advanced by the Government, but in a subsequent part of the opinion we will discuss more fully the legal problems engendered by the parties' confusion regarding the criminal charge actually made in that conspiracy count.
 
 
 4
 We turn to the indictment. Count I charged that from approximately September 1, 1974, to May 19, 1975, appellants Nerone, Seppi, Marvin "Pete" Hornstein, Gentry, Donald Hornstein, Bradley, Caples, Jamerson, and Helfer had participated in the operation of an illegal gambling business in violation of 18 U.S.C. § 1955.[2] Count II charged that appellants Seppi, Vieth, Gentry, Schellinger, and both Hornsteins had participated in the use of extortionate means to collect a gambling debt in violation of 18 U.S.C. § 894. Count III charged that Marvin "Pete" Hornstein had used a deadly weapon in a forcible assault upon a federal law enforcement officer engaged in the performance of his duties, in violation of 18 U.S.C. §§ 111 and 1114. Count VI charged that appellants Nerone and Seppi had conducted the affairs of Maple Manor, Inc., doing business as Cottonwood Cove Estates Mobile Home Park, an enterprise engaged in and the activities of which affected interstate commerce, through a pattern of racketeering activity and/or through collection of an unlawful debt, in violation of, inter alia, 18 U.S.C. § 1962(c). Finally, as stated in the Government's brief to this court, Count VII charged all of the appellants with conspiracy to conduct the affairs of Maple Manor, Inc., an enterprise affecting interstate commerce through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d).[3]
 
 
 5
 Testimony adduced at trial revealed that Robert Fox had conducted a weekend "casino gambling operation" involving dice and card games in the basement of his modular home. This particular mobile home was located on Lot 2 of the Cottonwood Cove Estates Mobile Home Park, which was operated by Maple Manor, Inc. The president and major stockholder of the corporation was Blanche Fox, mother of Robert Fox. The secretary of the corporation was appellant Seppi. The board of directors was composed of Blanche Fox, Seppi, and Nerone. Appellant Nerone had signed a form purchase agreement on April 21, 1973, for a three-bedroom Regent mobile home, manufactured in Indiana, from Mobile World, Inc., whose offices were located in Springfield. The purchase agreement bore the notation "For Resale," set forth a tax and a dealer number, and indicated that Nerone had executed the agreement on behalf of Maple Mobile Home Sales. Cash payment of the total sum mentioned in the purchase agreement was made two days later, and the Regent mobile home presumably was placed on Lot 88 of Cottonwood Cove. Many other residents of Cottonwood Cove had likewise purchased mobile homes manufactured in states other than Illinois.
 
 
 6
 The trial testimony established that the weekend dice and card games conducted in Fox's basement were conducted, with three exceptions, every Saturday and Sunday from early September 1974 to May 1975. The gambling in Fox's basement was discontinued in May 1975 because the Fox home was under surveillance by local law enforcement officials. Appellants Donald and Marvin Hornstein conducted a weekend card and dice gambling operation under the name "Where Else" at the Palmer Hotel at Fifth and Jefferson on two weekends in May 1975. It was raided on May 19, 1975. The appellants admitted at trial that the weekend games were illegal under Illinois law.
 
 
 7
 The testimony of Government witnesses also established that from September 1974 to May 1975 appellants Nerone and Seppi worked in Fox's basement dealing blackjack, running the dice game, and collecting and paying out money. Appellant Jamerson throughout this period also assisted the operation of the games by working at the dice game and by running errands. Appellant Bradley ran the dice game for most of the time when Fox's casino operation was functioning, and appellants Caples and Helfer each dealt blackjack and played poker for a few months while the illegal gambling was in operation. Appellant Gentry never gambled or operated any games in Fox's basement but did on two or three occasions open an inside door in Fox's basement in order to let people enter. Appellants Donald and Marvin Hornstein were not shown to have been actively involved in the casino when it was operated at Fox's basement, but there was circumstantial evidence, discussed hereinafter, which the Government utilized to support its theory that the "Where Else" gambling enterprise actually operated as an integral part of the Fox casino.
 
 
 8
 Law enforcement officers began investigating Fox's gambling operation in late 1974, and by early 1975 Steven Salmieri, a special agent of the Federal Bureau of Investigation (FBI) was working on the investigation. On February 13, 1975, he met with Donald Nance, who was to meet with Fox that morning to pay off a four hundred dollar gambling debt. Fox and Nance had had several telephone discussions concerning the debt, in one of which Fox threatened Nance, who thereupon said he would meet Fox "(a)t the Attorney General's Office." At 10:00 a. m. that morning, Salmieri and Nance went to the latter's health spa, where they awaited the planned meeting with Fox.
 
 
 9
 At approximately 10:15 a. m. Fox, together with the six men charged in Count II, arrived at the health spa in two cars. Appellants Schellinger and Seppi, who were the drivers, remained outside the spa. Fox, the Hornsteins, Gentry, and Vieth went inside. Upon entering the inner room where Salmieri and Nance were waiting, Fox said, in reference to Nance's earlier telephonic comment, "what was all this about the Attorney General?" Marvin Hornstein then asked Salmieri why the latter's hand was in his pocket. Hornstein then took a revolver from his belt and held it close to Salmieri's head. Fox threw Salmieri against a wall and "frisked" him, finding a gun that Agent Salmieri was carrying. Salmieri and Nance proclaimed that they wanted to pay Fox. As Salmieri approached a desk drawer, Fox said that if Salmieri went near the drawer Fox would kill him. When Salmieri later put his hand in his pocket to get a cigar, Fox said "Put your hands down or I'll knock your teeth out." After Fox swung at Salmieri with a gun and missed, Marvin Hornstein hit him in the ribs.
 
 
 10
 Fox inquired as to Salmieri's identity and the fact that he was carrying a gun. The agent told Fox that he was a friend of Nance's from St. Louis. Fox then told Nance to "forget the money." Except on the occasions when Salmieri and Nance brought up the subject, nothing was said during the entire encounter regarding the collection of the debt. During the entire incident, none of the appellants asked Nance for any money. On each occasion that agent Salmieri brought up the topic of paying the money, those appellants who had come into the back room responded that the money didn't make any difference and that they didn't want it. Fox then told Nance that they were going to take Salmieri "for a ride."
 
 
 11
 As Salmieri began to walk out of the back room of the health spa, Fox became excited and shouted, "Shoot him, shoot him. Leonard (Vieth), grab him." At that point the agent was going out the front door and Vieth was with him. As Salmieri went out, he put his hands up. Vieth then said, "Come on, we better go back inside." Vieth then grabbed the agent by the arm. After going back in, the agent was told to spread out on the floor. Nance and his business partner were also in the front on the floor. After Fox told them to walk out of the health spa but before they had a chance to get out, Marvin Hornstein came to the front of the room where Salmieri remained on the floor, cocked the gun, put it to the agent's head, and said he was going to "blast" him. Salmieri and Nance were then taken outside, but Fox and his confederates left without them. Salmieri and Nance then returned to the health spa.
 
 
 12
 At 11:45 the same morning, Fox telephoned Nance and apologized for the incident at the health spa. He asked Nance to come out to the Cottonwood Cove, with Salmieri, to repay the debt. That afternoon, Nance and Salmieri visited Fox's mobile home. Appellants Donald Hornstein, Nerone, Seppi, Caples, Jamerson, and Gentry were present. Nance paid Fox, and Fox showed Salmieri his basement casino and invited him to return to gamble. When Salmieri requested the return of his gun, Fox replied that Marvin Hornstein had it and that they would try to get it back.
 
 
 13
 On February 22, 1975, Agent Salmieri arrived at Cottonwood Cove and went into the recreation hall, which was adjacent to Fox's mobile home, where a party was in progress. There he found Gentry and told him that he had come for "a little action." Gentry, remarking that "(t)hey've got a pretty good game," took Salmieri next door to Fox's mobile home. He knocked on a basement door containing a two-way mirror, and they were admitted. Inside Salmieri observed seventy to eighty people. Fox told him that the minimum bet was five dollars and the maximum was one hundred dollars, but that with approval a player could bet more, provided he remained at the higher level throughout the night. Salmieri got into a blackjack game in which appellant Nerone was the dealer. In the course of the evening the house took in between four and five thousand dollars at the blackjack table alone. Salmieri observed Fox approve loans of up to $700 for customers at the blackjack table, and cash a four or five hundred dollar check for another customer. Salmieri also observed appellants Seppi, Caples, Bradley, and Jamerson working at the dice table. Throughout the night appellant Gentry was "watching" the door.
 
 
 14
 On March 9, 1975, Agent Salmieri returned to the casino with John Meduga, an agent of the Illinois Bureau of Investigation. They gambled for three or four hours, and during that period Salmieri observed twenty-five or thirty people in the casino. He also observed Fox lend five hundred dollars each to one customer who already owed him $3,000 and to another who was already $2,000 in debt. In the course of the night Nerone and Caples dealt at the blackjack table, and Seppi, Caples, Bradley, and Jamerson ran the dice game. On March 23, 1975, Salmieri and Meduga were again in the casino where they observed Nerone and Helfer dealing blackjack and Seppi and Bradley operating the dice table. On this occasion Marvin Hornstein was present in the basement.
 
 
 15
 The two agents returned once more to the casino on April 13, 1975. Appellant Helfer was dealing blackjack that night, and appellants Seppi and Nerone were operating the dice table. That evening Salmieri told Fox that earlier in the day he had wanted to place a bet on a baseball game but was not able to do so because he did now know any bookies in town. Fox replied that any time Salmieri wanted to get any action in, he should let him know and Fox would cover it. Fox then gave Salmieri a telephone number for placing bets, but warned him not to call the number from out of state because he did not want the FBI to get involved. Testimony of the Government witness Charles "Burrhead" Albright established that Nerone would take line information and accept bets on the telephone. Albright was also present during numerous conversations between appellants Nerone and Greco regarding line information, and he had heard Fox instruct Nerone to "lay-off" bets to Greco. Several weeks after Fox gave Salmieri the telephone number, the agent called and asked for Nerone. Salmieri attempted to place bets on a Spirits basketball and Cardinal baseball game, but Nerone would not accept the bets because he did not have "the line" on those games. However, Salmieri did place a bet on a National Basketball Association game between Washington and Buffalo. Nerone also gave Salmieri two additional telephone numbers.
 
 
 16
 On the evening of May 11, 1975, Agents Salmieri and Meduga went to the "Where Else" at the Palmer Hotel. Initially, they had gone to the recreation hall at Cottonwood Cove. There, they found a sign which read "call Bob (Fox) or John (Nerone)" and which listed a telephone number. Salmieri dialed the number and reached Nerone, who said "(t)here's a little problem in the area. We have moved to the Palmer Hotel." At the hotel, the agents observed Nerone, Seppi, Bradley, and Donald Hornstein take turns running the dice table. Appellant Helfer volunteered to start a blackjack game, and Marvin Hornstein was acting as a lookout at the door. The house took in roughly twenty-four hundred dollars that evening.
 
 
 17
 On May 17, 1975, there was some form of gambling at the Cottonwood Cove. Agent Nancy Lewis, working underground for the Illinois Bureau of Investigation, had been conducting a surveillance at the Cottonwood Cove since December 26, 1974. She kept memoranda of her observations. Her reports indicated that she had observed thirteen cars at Fox's trailer at 1:40 a.m. on May 17. Almost five hours later, at 6:05 a.m., she observed that the cars of six individuals known to her were parked at Fox's trailer. On May 18, 1975, law enforcement officers raided the "Where Else." Agents Salmieri and Meduga were present on that evening and observed appellants Nerone, Seppi, Bradley, and the two Hornsteins take turns running the dice table at the hotel.
 
 
 18
 On the same night that the Palmer Hotel was raided, FBI agents, acting pursuant to a search warrant, raided Fox's mobile home and found bookmaking records in the lining of one of Fox's coats. These records pertained to the same transactions as did gambling papers found on Nerone in the raid at the hotel. In Fox's home, the agents found baseball schedules of a type commonly distributed by bookmakers to their customers, a "baseball calculator" or device similar to a slide rule used by bookmakers to calculate the amount of payoffs in baseball parley bets, and dice which had been altered to increase the likelihood that certain sides would come to rest face up.
 
 
 19
 * The first issue in this case pertains to the jurisdictional basis for Count I. Appellant Helfer argues that there was no proof that the weekend gambling in the Fox basement met the jurisdictional requirements of 18 U.S.C. § 1955. Helfer observes that the statute is directed at syndicated gambling having an effect upon interstate commerce and the national interest. He further contends that the gambling reflected in this record is not the type of gambling which falls within the purview of the statute and that the facts of this case illustrate an effort by the Federal Strike Force to create a federal offense from essentially local gambling activity. Helfer points to the Government's use of such nomenclature as "casino operation" the participants of which were denominated "employees" as constituting the substitution of objurgatory terminology for proof. He further insists that the Government found it necessary to confuse the long standing and continuous bookmaking of appellants Nerone and Greco with the games of chance in which the other nine appellants participated.
 
 
 20
 Helfer also claims, as a corollary to the jurisdictional argument, that his conviction on Count I must be reversed because of variance and erroneous instructions. Bookmaking was not alleged in Count I. Thus, Helfer sets out a straightforward argument invoking the concept of variance. He submits that the Government cannot charge ten defendants with games of chance, i. e., "cards and dice," and then claim that instead they have proven bookmaking by two defendants to meet the statute's jurisdictional requirements. Helfer asserts that the Government compensated for an obvious variance and absence of proof by submitting instructions, given by the court over the appellants' objections, which directed the jury to consider the bookmaking activity to determine if the games of chance were in substantially continuous operation for a period in excess of thirty days.
 
 
 21
 Putting aside for the moment the question of erroneous instructions, the core question as to all appellants convicted under Count I clearly relates to proof of "substantially continuous" operation in excess of the statutory period. On the present record, proof of the five-man requirement is sufficient to withstand attack. Reviewing the evidence in the light most favorable to the Government, we hold that Fox, Nerone, Seppi, Bradley and Caples were clearly shown to have conducted, financed, managed, supervised, directed or owned all or part of an illegal gambling business. If the evidence similarly establishes that the thirty-day requirement was met, the illegal gambling business disclosed by this record was subject to federal criminal prosecution.
 
 
 22
 We recognize that Congress "has placed strict limits on those gambling operations which warrant federal intervention." Altese, supra at 109 (Van Graafeiland, J., dissenting). Nonetheless, the purpose of § 1955 is to prohibit illegal gambling of such a size as would affect interstate commerce. See United States v. Hawes, 529 F.2d 472, 478 (5th Cir. 1976). See also United States v. McCoy, 539 F.2d 1050 (5th Cir. 1976). Still, the purpose of § 1955 is not to subject almost any small gambling operation to federal regulation. See United States v. Bridges, 493 F.2d 918, 922 (5th Cir. 1974). We can readily agree with the Fifth Circuit that a broad construction of § 1955 would not always further the Congressional purpose, see id., and that "the contours of federal jurisdiction under § 1955 have not yet been fully delineated." McCoy, supra at 1058. Congress, however, in final analysis, has made a judgment that gambling operations involving more than five people and operating in excess of thirty days affect interstate commerce. This court has no power to excise as trivial, an individual instance falling within the defined class which is within the reach of federal power. Cf. Maryland v. Wirtz, 392 U.S. 183, 192-93, 88 S.Ct. 2017, 20 L.Ed.2d 1020 (1968).
 
 
 23
 We agree with the Government that the thirty-day requirement was satisfied in this case. More accurately stated, we think that there was sufficient evidence from which the jury could find that the dice and card games in Fox's basement were in "substantially continuous" operation for the statutory period. The evidence showed that, with but three exceptions, Fox's casino was in operation every weekend between the beginning of September 1974 and early May 1975. The evidence thus showed an established pattern of operation at least two days every week for approximately eight months. Simple arithmetical calculations would support a jury inference that the games took place on more than thirty individual calendar days. Moreover, there was testimony that sometimes gambling commenced on Friday nights and continued into the succeeding Monday. Larry Dellomo, a salesman for Mobile World, Inc., testified that he had participated in gambling at Fox's basement approximately fifteen times, usually on Saturday or Sunday nights, during the period charged in the indictment. William Roscetti, a dentist, also testified that he had gambled in Fox's basement from five to eight times during the same period.
 
 
 24
 The appellants do not appear to controvert the inference that gambling occurred on more than thirty separate calendar days. Their argument touches instead on the requirement of continuity. We note, however, that Congress did not purport to require absolute or total continuity in the gambling operations. Thus, we agree with the Government's contention that it would be unreasonable to construe the term "substantially continuous" as meaning every day.
 
 
 25
 There was ample evidence for the jury to conclude that what was involved here was a gambling casino which operated substantially continuously by virtue of being open for business almost every weekend with consistent regularity. We do not read the Congressional intent as requiring proof of an operation occurring substantially around-the-clock but rather one that was operated upon a schedule of regularity sufficient to take it out of the casual non-business category. The proof here met the test.
 
 
 26
 We further agree that Helfer's allegation that the Government used the bookmaking activity as a means of meeting the requirements of the statute is without substance. The evidence of continuity in Fox's casino operation needed no assistance but was self-sufficient for the purpose. As to the claimed instruction error, the court's definition of gambling as including "bookmaking" merely set forth a portion of the statutory language. See Appendix. We do not interpret the instruction as directing the jury to consider that particular form of illegal gambling in determining the substantial continuity of the casino operation. Indeed, a distinct instruction expressly left for the jury's determination that significant factual question.[4] Helfer's argument that the instruction improperly bolstered the assertion of federal jurisdiction accordingly must be rejected. We affirm his conviction on Count I.
 
 II
 
 27
 Appellants Gentry and the Hornsteins similarly contend that the evidence was insufficient to sustain their convictions on Count I. The Government responds, as to Gentry, that his performance of the function of " doorman" demonstrated that he was part of the casino operation. In so arguing, the Government asserts that both Charles Albright and Agent Salmieri testified that Gentry "guarded" the door to the casino. As to the Hornsteins, the Government asserts that there was ample evidence that the Palmer Hotel was merely a new location for the casino operation which had been operating at Cottonwood Cove. The Government specifies particularly the note listing a Palmer Hotel telephone number and Nerone's assertion to Agent Salmieri that they had "moved" to the Palmer Hotel.
 
 
 28
 Close review of the trial transcript does not support the Government's theory that Gentry guarded the casino door. Although Salmieri did give Gentry's name when asked whether he had seen anyone "guarding" the door area,[5] he never did state expressly that Gentry "guarded" the door, nor really, and more to the point in view of the conclusionary nature of the word "guard," did he testify as to activities by Gentry which would appear to be guarding. Likewise, Albright's testimony did not support that characterization. Albright, who was a star witness for the prosecution, stated that Gentry would "(t)ake care of the door a little bit" and that he might "have been a body guard, I don't know." Albright also made a reference to the fact that Gentry had opened both doors to Fox's basement. The prosecutor interpreted this language as pertaining to a guarding function, going so far as to state in closing argument, mistakenly in our view, that Albright had stated, "Well, he guarded both of them (the doors)." (Emphasis supplied.) Our examination of the trial transcript discloses no such statement. Without regard to Gentry's complaints about persistent prosecutorial misstatements of the evidence, we note that numerous witnesses established that Gentry never gambled or assisted in the operation of any of the games. Gentry usually sat in the bar area and tried to sell Indian jewelry. We are satisfied that the Government has failed to establish that he was an employee or a participant in the casino operation. Accordingly, his conviction on Count I of the indictment is reversed.
 
 
 29
 As to the Hornsteins, the Government concedes that they were not shown to have been actively involved in the casino when it was operated at Cottonwood Cove. The Government asserts, however, that the Hornsteins clearly worked for it at the Palmer Hotel. Apart from the note and Nerone's statement, the Government pinpoints the evidence that Fox, Nerone, Seppi, Bradley and Albright "worked" at both locations and Agent Meduga's testimony that the operation at the "Where Else" was "just about identical" to that at Fox's mobile home. It also points to the evidence of Nerone's bookmaking at the hotel, conceding, however, that this evidence was not used as evidence of the illegal gambling business charged in Count I. The Government discounts the significance of the considerable testimony that the Hornsteins owned the gambling operation at the Hotel, that the games there operated were "head-to-head" rather than "house" games (as in Fox's basement), and that the Hornsteins themselves, without financial input from Fox and Nerone, were responsible for maintaining a sufficient reserve of funds to cover the losses which might occur at the "Where Else." By discounting the evidence tending to show that the Hornsteins' operation was separate and independent, of course, the Government adheres to its basic theory that the "Where Else" was operated for the approximate three week period in May 1975 in conjunction with, and as an "alternative gambling location" for, the illegal gambling business run by Fox and his associates.
 
 
 30
 The key circumstantial evidence to support the inference that the games were moved to the Palmer Hotel as an accommodation to and to facilitate Fox's operation was the fact that a note was found at the recreation hall at Cottonwood Cove telling Fox's patrons to go downtown where some gambling was occurring. While downtown, various defendants, who were involved in Fox's games, operated the "stick," served liquor and performed other minor tasks at the Fifth Street location. However, there was substantial direct and circumstantial evidence presented both by the Government and the appellants which militates against any inference that there was a connection between the two gambling operations. Significantly, trial testimony, unrebutted by the Government and coming from its own witnesses, indicates that there was gambling at the Cottonwood Cove, including the playing of dice, two days before the raid on Fifth Street. The surveillance notes of IBI Agent Lewis showed the presence of a dozen or more cars around Fox's establishment in the early morning hours. These automobiles belonged to persons who were known to frequent Fox's basement for purposes of gambling. Such evidence, albeit circumstantial, undercuts the Government's theory that the Palmer Hotel was an alternative location.
 
 
 31
 We shall have occasion hereinafter to comment upon the manner in which the Government has confused its theory of the case with inferences properly to be drawn from the evidence. At this point, we need only state that the trial testimony, measured in the light of the reasonable doubt standard and in conformity with Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942), is not sufficient to convict the brothers Hornstein of a violation of 18 U.S.C. § 1955. Thus, we need not consider Marvin Hornstein's claim that the trial court's admission into evidence of his brother's post-conspiracy statements to FBI agents prejudiced his defense to the § 1955 count.[6]
 
 
 32
 Finding no reversible error as to the defendants convicted under Count I, with the exceptions noted of Gentry and the two Hornsteins, we affirm all other convictions under this Count.
 
 III
 
 33
 Appellants Seppi, Vieth, Gentry, Schellinger, and the Hornstein brothers present a variety of arguments aimed at showing that the convictions on Count II must be reversed. Allowing for the variations in formulation, the essential thrust of the common sufficiency of the evidence argument is that the Government has not proved that these six appellants knowingly participated in the use of extortionate means to collect or attempt to collect a debt. The first prong of the argument is that the evidence abundantly shows that the sole reason for Fox's visit to the health spa was to stop Nance from going to the Attorney General, so that the collection of Nance's debt was not really involved in the incident.[7] We think that the jury could properly infer that all the appellants went to the health spa for the purpose of attempting to collect a debt. The second prong of the argument relates to knowledgeable participation in the extortion episode. The Government conceded at oral argument that its case, in this respect, is dependent on Albright's testimony.
 
 
 34
 According to that testimony, he had been in Fox's mobile home at around ten o'clock. He further testified that Fox, Seppi, Vieth, Schellinger and Donald Hornstein were present. As Albright entered, Fox was calling Gentry on the phone. Albright heard Fox say that they were going down to the health spa to put muscle on a guy. After Gentry arrived, there was more conversation, which Albright heard. He stated that Fox had mentioned something to do with the reason they were going to put muscle on the guy. The record discloses this colloquy:
 
 
 35
 Q. What did he (Fox) say the reason was?
 
 
 36
 A. He (Nance) wasn't going to pay off and he (Fox) was going down and tear the place up or get his money.
 
 
 37
 Immediately after this conversation, according to Albright, the appellants left for the health spa.
 
 
 38
 The appellants quarrel with Albright's version of what happened in or around Fox's mobile home on the morning of February 13, 1975. Nevertheless, the jury was entitled to credit Albright's version. Moreover, there was a tape recording of the incident itself played at the trial. Although that recording does tend to show that Nance's remark about the Attorney General and Salmieri's possession of a gun were factors when the confrontation occurred, it also established that the $400 debt played an important role. Thus, the tape contains the statement, presumably that of Fox, to this effect:
 
 
 39
 We don't care about the money now. I'm not forgetting. The money's no object now. (Emphasis added.)
 
 
 40
 That Fox's associates lost interest in collecting the money because of mounting anger arising from Salmieri and Nance being armed or because of Nance's earlier remark does not mean that there was no attempt to collect an extension of credit. Albright's testimony inculpated all of the appellants charged with the extortion. Absent a determination that Albright's version was completely incredible, which we cannot make on the present record, there was ample evidence from which the jury could find a violation of § 894.
 
 
 41
 We note that the extortion incident was one of the overt acts charged in the conspiracy count of the indictment. We therefore consider at this point the problem of the claimed use of post-conspiracy admissions by the admission of the statements of Schellinger and Gentry which, speaking generally, indicated that they knew that the purpose of the visit to the health spa was to recover a debt owed by Nance to Fox. The Government's assertion that the statements "implicated no one but themselves" may be arguably incorrect. Nonetheless, the statements did not directly implicate any of the other appellants charged in Count II. Therefore, any error of admitting the statements did not reach constitutional proportions under Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). See United States v. Fellabaum, 408 F.2d 220, 225 (7th Cir. 1969); United States v. Guajardo-Melendez, 401 F.2d 35 (7th Cir. 1968). Moreover, the trial court correctly instructed the jury as to the limited purposes for which the Schellinger and Gentry statements could be used.[8] Inasmuch as the jury was so instructed and in view of Albright's testimony showing that the other appellants knew the purpose of the visit to the health spa, we conclude that any error in admitting the post-conspiracy statements was harmless.
 
 IV
 
 42
 Appellant Marvin Hornstein contends that the instructions pertinent to Count III, when taken together, were prejudicial to his theory of defense. His specific instruction challenges are somewhat "straw-grasping" in nature, but Hornstein presents a very substantial challenge to the manner in which all objections were handled. That matter deserves extended comment.
 
 
 43
 Hornstein concedes that the trial court informed the appellants of its proposed instructions prior to closing arguments, but contends that Rule 30, Fed.R.Crim.P., was violated in that the defense was not given an opportunity to inform the court of its objections or to request permission to withdraw instructions which they had originally tendered, prior to arguments to the jury and submission of the court's instructions to the jury. Hornstein observes that the reviewing court sanctions the practice of promoting potential error in jury trials when it allows the trial courts to engage in a policy of denying the defendant the right to make objections to instructions prior to submission to the jury.[9]
 
 
 44
 We agree with appellant Hornstein that both the letter and the spirit of Rule 30 were violated in this case. The record establishes that there was an informal instructions conference prior to argument but that the trial judge put off the formal statement of objections until after the jury began its deliberation. This court stated in United States v. Hollinger, 553 F.2d 535, 543 (7th Cir. 1977), as follows:
 
 
 45
 If, however, the judge conducts only an informal conference prior to the giving of the charge as to what requests will be granted or denied and what instructions the judge intends to give, a full opportunity must be given after the jury has been instructed, but before it begins to deliberate, for counsel to make a full record on their objections to the charge as given as well as to the denial of requests. Further . . . full opportunity must be given after the statement of the charge and before the retirement of the jury to state any additional objections which may have developed as a result of the giving of the charge. (Emphasis added.)
 
 
 46
 Applying that language to the instant case, it clearly appears that the trial judge's handling of objections failed to comply with this circuit's requirements.
 
 
 47
 However, this trial took place some months before the decision in Hollinger. The question thus becomes one of determining the consequences of refusing to allow counsel an opportunity to voice their objections to instructions before the jury retires. The language of the rule suggests the answer.[10] A party who fails to make timely and specific objections to the jury charge loses the opportunity to assign as error any portion of the charge or omission therefrom. When a trial judge prevents the party from complying with the rule, the remedy should be appellate consideration of the claimed errors in instruction. Our prior decisions are consistent with this approach. E. g., United States v. Lisowski, 504 F.2d 1268, 1272 (7th Cir. 1974); American National Bank and Trust Company v. Aetna Insurance Company, 447 F.2d 680, 683 (7th Cir. 1971). We do not say that an outright reversal is beyond either our power or a distinct possibility. We merely state that appellate review of Hornstein's contentions with respect to Instructions 31, 36, 37, and 38 suffices in the instant case.
 
 
 48
 Appellant Hornstein submits Instruction No. 31 as an apt illustration of why a conference on jury instructions should have been held prior to the submission of the case to the jury. The instruction purported to set forth what the charge was under Count III.[11] Hornstein accurately observes that there was not a single bit of evidence in the record to indicate that he had used a .38 caliber super automatic weapon in the incident at the health spa. The evidence from the Government's witness was that the weapon used by the appellant was a .357 magnum. Arguing that the appellant is entitled to a charge consistent with the indictment, Hornstein asserts that a technical compliance with a requirement that the jury can convict only on the basis "as charged" and as directed by the court warrants reversal of the conviction on Count III.
 
 
 49
 There is no question but that Instruction No. 31 is inaccurate. If the trial court had allowed formal objections at an earlier time, no doubt the incorrect reference to the particular weapon would have been corrected. However, we agree with the Government that the incorrect identification could have had no bearing on the jury's determination of guilt or innocence. Moreover, the judge allowed the jury to take the indictment into the jury room during its deliberations. Because the indictment made absolutely no reference to the type of weapon, Hornstein was not prejudiced by the court's inaccurate summation. The factual mistake was more akin to a comment on the evidence, albeit inaccurate. Hornstein implicitly admits the trivial nature of the mistake. We think that No. 31 posed no real possibility of prejudice, especially in view of the court's instruction that the jury alone was the sole exclusive judge of the facts. Cf. United States v. Rodriguez, 498 F.2d 302, 308-09 (5th Cir. 1974).
 
 
 50
 Hornstein challenges Instruction No. 36, which was an exact reading of Devitt and Blackmar, Federal Jury Practice and Instructions § 42.04 (3d ed. 1977), as unnecessarily emphasizing the Government's proof and as bearing too much similarity to the facts in the present case. We think that the instruction accurately states the law. Any supposed prejudice arising from the fact that its second paragraph duplicates the evidence in the case flows from the more fundamental reality that Hornstein's assault on Agent Salmieri represented the exact type of conduct which the statute prohibits.
 
 
 51
 Hornstein's objection to No. 37 is similarly without merit. He contends that the court erred in modifying the last sentence of Devitt and Blackmar § 42.11 ("Defense of Another Effect"). As tendered, Hornstein's Instruction No. 5 stated that the appellant would not be guilty of assaulting Salmieri willfully within the meaning of the charge and was entitled to a finding of not guilty if the jury found that the defendant acted in good faith and because of a reasonable belief in the appearances that Salmieri was engaged in an apparently unprovoked and unlawful assault upon Robert Fox and others. The court modified the instruction by changing the last clause to read "(T)hen you may consider these factors in determining the guilt or innocence of said defendant of this charge contained in said count III." However, as the Government points out, the court gave, essentially unmodified, Hornstein's Instruction No. 10 as the Court's No. 35. This instruction defined the term " wilfully."[12] When this instruction is coupled with No. 37, the clear import is that the jury should find Hornstein not guilty if they found that he was acting in self-defense. We think the self-defense instruction, read in context, adequately instructed the jury on this phase of the defense.
 
 
 52
 Finally, Hornstein challenges Instruction No. 38, which stated that knowledge of the identity or official character of the person assaulted is not an essential element of the offense. This instruction correctly states the law. See United States v. Feola, 420 U.S. 671, 95 S.Ct. 1255, 43 L.Ed.2d 541 (1975). See also United States v. Hillsman, 522 F.2d 454, 459-60 (7th Cir. 1975). Moreover, the trial court supplemented No. 38 with Hornstein's No. 8.[13] Hornstein submits that the latter instruction is a proper statement of the law, but suggests that it is inconsistent with the former. We think this contention totally untenable. Both instructions accurately state the law, and there is no inconsistency. While knowledge of the officer's status is not an essential element of the offense, lack of knowledge may be relevant and material to the defenses either of self defense or the defense of others. See generally Hillsman, supra at 460-62.
 
 
 53
 Because the jury was adequately instructed on the assault charge, Hornstein's conviction on Count III must be affirmed.
 
 V
 
 54
 Appellants Seppi and Nerone launch a sometimes confused, but an ultimately successful, attack on the convictions under Count VI. Their argument contains two fundamental prongs: first, that the Government failed to prove that Maple Manor, Inc. was engaged in or its activities affected interstate commerce; and second, that the Government failed to prove that appellants Seppi and Nerone engaged in the conduct of the affairs of the charged enterprise through a pattern of racketeering activity or collection of unlawful debt. The Government does not meet this argument, for it views the second prong as "essentially the same claim as the challenge to the court's charge on interstate commerce." Accordingly, the Government responds that the interstate commerce requirement of 18 U.S.C. § 1962(c) was met because, in its view, the evidence showed both that Maple Manor provided rental space for trailers manufactured out of state and that the affairs of Maple Manor, Inc. were conducted through a pattern of racketeering that included violations of 18 U.S.C. § 1955.
 
 
 55
 Before setting out a detailed exposition of the contentions of the parties and explaining the reasoning behind our holding that the convictions on Count VI must be reversed, we initially note our recognition that § 1962(c) was intended by Congress as a potent weapon against organized crime. In United States v. Cappetto, supra, 502 F.2d at 1358, this court recognized that Congress' intention was not only to protect against the infiltration of legitimate organizations by organized crime but also included an illegal gambling business in the categories of "racketeering activity" and "enterprise." The present appeals present questions bearing upon the proper prosecution of a criminal case where the Government undertakes to establish that such infiltration has actually occurred. We have no occasion, therefore, to address directly the issues determined in Cappetto.[14]
 
 
 56
 The appellants assert that Count VI is fatally defective because Maple Manor, Inc. was involved in a wholly intrastate activity, i. e., the rental of pieces of real estate upon which mobile homes or trailers could be parked. They further assert that the jurisdictional requirements which the Government is required to meet in charging a violation of § 1962 are different from those which the Government is required to meet in charging a violation of § 1955. Next, significantly in our view, they correctly point out that the only attempt of the Government to establish a nexus between the charged enterprise and interstate commerce was the purchase of mobile homes manufactured in states other than Illinois by residents of Cottonwood Cove.
 
 
 57
 The case authority for the appellant's contention is that interstate commerce was not involved in Count VI is Sun Valley Disposal Company v. Silver State Disposal Company, 420 F.2d 341 (9th Cir. 1969); Diversified Brokerage Services, Inc. v. Greater Des Moines Board of Realtors, 521 F.2d 1343 (8th Cir. 1975); and Marston v. Ann Arbor Property Managers Association, 422 F.2d 836 (6th Cir.), cert. denied, 399 U.S. 929, 90 S.Ct. 2244, 26 L.Ed.2d 796 (1970). Appellants' reliance on these cases is misplaced. In our view, the more recent decision of Goldfarb v. Virginia State Bar, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975), demonstrates that transactions related to real estate do "affect" interstate commerce. By providing rental space for trailers manufactured out of state, Maple Manor, Inc. indirectly fostered interstate sales of mobile homes. Proof of the sales of mobile homes to residents of Cottonwood Cove sufficiently established the necessary connection, for purposes of § 1962, between that enterprise and interstate commerce. We therefore conclude that the jury could properly find that the activities of Maple Manor, Inc. "affected" interstate commerce.
 
 
 58
 Appellants Seppi and Nerone formulate the second prong of their argument by first noting that the Government could have drafted the indictment by charging the "enterprise" consisting of Fox, Nerone, and Seppi to the exclusion of Maple Manor, Inc. They assert that the Government had a two-fold purpose in including the corporate entity. First, the Government wanted to bring the conduct of Fox within the scope of § 1962. Second, the Government wanted to secure a forfeiture of the property of Maple Manor, Inc. under 18 U.S.C. § 1963. The appellants further contend that the Congressional use of the word "through" in § 1962(c) was not intended to be meaningless. They submit, correctly we think, that the most logical definitions to ascribe to that word as used in the statute are "by means of, in consequence of, by reason of." See Black's Law Dictionary 1652 (Rev. 4th ed. 1968). Their fundamental contention, although we have somewhat paraphrased it, is that if the word "through" is to have operative meaning, the Government must offer some proof that the affairs of the charged enterprise were conducted through a pattern of racketeering activity or through collection of unlawful debt.
 
 
 59
 The appellants' approach to the statutory language gives meaning to its individual words. We do not understand the Government to attack the appellants' view of the proof requirement. Instead, as noted, the Government has contended that the evidence satisfied this requirement. Unfortunately, however, the Government has, perhaps inadvertently, reversed the proof analysis. Thus, it asserts that Maple Manor "existed in substantial part as a vehicle for applicants' illegal gambling operation." The only fair implication of this formulation is that Fox, Seppi, and Nerone conducted the casino operation through the mechanism of the mobile park corporation. The Government further asserts that the jury could reasonably conclude that "Fox and his associates used the mobile home park to house, promote, and conceal their illegal gambling operation." Once again, however, this statement can only be read as suggesting that the casino operation was advanced through the instrumentality of the corporation.
 
 
 60
 On this appeal, it is clear to us that the Government has been arguing that the casino operation, which was itself arguably a prohibited enterprise, see note 3 supra, was facilitated through the cover of a legitimate enterprise. This court can readily agree that the jury could infer that such was the fact. The problem with the Government's case, however, is that the indictment charged that the affairs of the mobile home park corporation, not the casino operation, were conducted through a pattern of racketeering activity. Our examination of the record leaves us with the abiding conviction that the Government never really crystallized its theory of the case. It made no attempt to show that the proceeds of the casino operation were invested in Maple Manor, Inc. Nor did it endeavor to show that gambling revenues were used by or in any way channeled into the corporation or that persons were paid out of gambling revenues to perform services for Maple Manor, Inc.
 
 
 61
 Instead, the Government appears to have assumed throughout this case, both at trial and on appeal, that the casino operation and the mobile home park corporation somehow constituted a merged, illegitimate-legitimate enterprise.[15] Examination of the trial transcript discloses that the Government never did attach significance to the use of the word "through," included both in the statute and in the indictment. The Government's case must fail because of a total want of proof of the connection between the racketeering activities and the affairs of Maple Manor, Inc. Geographical juxtaposition of the enterprises is insufficient.
 
 
 62
 We have no occasion at this point to comment upon appellant Greco's suggestion that the confusion in the instant case stemmed from a "faddish" use of a new and complex statute (RICO) by the United States Attorney. Nor need we pursue the abstract possibility that Maple Manor, Inc., which had a substantially legitimate operation, could not have existed or survived except from revenues derived from Fox's casino operation. While we can agree that the Government introduced sufficient evidence from which a jury could reasonably conclude that Fox's "casino operation" was conducted through a pattern of racketeering activity, we must note that there was a total failure of proof that the affairs of Maple Manor, Inc. were so conducted. The Government could have framed the indictment and prosecuted the case against Fox's gambling enterprise. Had it done so, we would have no difficulty in concluding that the convictions obtained under such a theory are sustainable on the basis of the present record. The dispositive fact, however, is that the Government chose to frame its indictment quite differently. The prosecuting team apparently assumed, but did not prove, that the affairs of the corporate enterprise charged in the indictment were advanced through racketeering. We therefore reverse the convictions under Count VI.
 
 VI
 
 63
 The twelve appellants advance a number of arguments as to why the convictions on Count VII must be reversed. We need not discuss all the contentions, for it is clear that the Government cannot sustain the judgments of conviction.
 
 
 64
 Earlier in this opinion, we observed that the wording of Count VII, the conspiracy count, is susceptible of two readings. As noted, the Government reads that count as charging that the appellants conspired to conduct the affairs of Maple Manor, Inc. through a pattern of racketeering activity. In their briefs and at oral argument, most of the appellants flatly state that the "enterprise" charged in the conspiracy count is the mobile home park corporation. If we assume that the indictment is to be read in that fashion, the reasoning applicable to Count VI also carries over to Count VII. That is, the Government totally failed to prove that the appellants agreed to conduct the affairs of the corporation through racketeering activity.
 
 
 65
 It is, however, possible to read Count VII as charging that the appellants conspired to conduct the affairs of Fox's gambling "enterprise" through a pattern of racketeering. Apart from proof of the interstate commerce nexus, we have no problem with the sufficiency of the evidence under this alternative reading. There might be a due process problem in affirming a conviction on the basis of a theory of the case which none of the parties ever entertained. However, we might note that the trial court's instruction on Count VII did not make the mistake of equating the "enterprise" there charged with that charged in Count VI. Absent any plain error in the charge, and with considerable evidence supporting a jury verdict on the actual charge in the indictment, the likelihood that appellants could successfully make out a due process argument is questionable.
 
 
 66
 Nonetheless, the statute requires that the charged enterprise be engaged in or pursue activities affecting interstate commerce. The Government never attempted to prove that the casino operation engaged in or so affected interstate commerce. Indeed, there was testimony that Fox and his associates wanted to avoid attracting the interest of the FBI and thus avoided any kind of conduct which might provide an interstate commerce element. At oral argument, once it became clearer that there might be two enterprises involved in this case, the Government argued that Congress intended to exercise its Commerce Clause powers so far as possible when enacting § 1962. In essence, it appears to argue that by satisfying the five-man and thirty-day requirements of § 1955 on Count I the prosecution had necessarily proved a sufficient nexus as to sustain the Count VII convictions.
 
 
 67
 We must reject that argument. Aside from the arguable unfairness of sustaining these convictions upon an entirely new theory, we hold that the jurisdictional requirements which the Government is required to meet in charging a § 1962 violation differ from those it must meet in charging a § 1955 violation.
 
 
 68
 In United States v. Hunter, 478 F.2d 1019, 1021 (7th Cir. 1973), cert. denied, 414 U.S. 857, 94 S.Ct. 162, 38 L.Ed.2d 107 (1973), this court interpreted the holding in Perez v. United States, 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971), as allowing the conclusion that Congress' special findings that illegal gambling involved widespread use of, and had an effect on interstate commerce and the facilities thereof was "sufficient to support the statute (§ 1955) even when applied to individual members of the class whose own activities may not have any demonstrable impact on interstate commerce." Accord, Cappetto, supra, 502 F.2d at 1356. Thus, proof of the use of or effect on interstate commerce is not required in order to prove a § 1955 violation. As we stated in Cappetto, id., the cases "demonstrate that Congress had power to determine that the class of activities described in Section 1955 adversely affects interstate commerce and, based upon that finding, to prohibit those activities."
 
 
 69
 We are unable to apply the same rationale to § 1962. First, the special legislative findings set out as Part A of Title VIII of the Organized Crime Control Act of 1970, P.L. 91-452,[16] have no counterpart in Title IX of the Act.[17] It is true, of course, that § 904(a) of the Act states that the provisions of Title IX "shall be liberally construed to effectuate its remedial purposes." However, the legislative mandate that the courts liberally construe the statutory language does not authorize the judiciary to deviate from the clear and unambiguous meaning of the statute. While there has been some dispute about the meaning of the word "enterprise" in § 1962, see, e. g., Altese, supra, 542 F.2d at 106-07, there can be no dispute that any such "enterprise"[18] must be one engaged, in, or the activities of which affect, interstate or foreign commerce. 18 U.S.C. § 1962(c). Second, the definition of "illegal gambling business" used for purposes of § 1955 cannot be construed as carrying over to § 1962. That particular definition is clearly limited to the former section,[19] just as the special findings applicable to syndicated gambling relate only to Title VIII. This court would twist and distort carefully drawn statutory language were it to transfer the findings and definitions of one part to an entirely different part of the statutory scheme.[20]
 
 
 70
 Our approach to the interstate commerce requirement is consistent with the legislative history. Shortly before the passage of the Act, the Assistant Attorney General, Criminal Division, Department of Justice, communicated to the Chairman of the Committee on the Judiciary of the House of Representatives the Department's views regarding certain issues relating to the then-pending bill. See 2 U.S. Code Cong. & Admin.News 4059-70 (1970). In setting out the position of the Department of Justice, the official explained that "Federal jurisdiction under title VIII rests upon specific findings of the Congress . . . ." Id. at 4064. Still later, it was noted that
 
 
 71
 (a)s is accurately reflected in the findings of part A, illegal gambling operations have a direct effect upon interstate commerce. Under its authority to regulate or prohibit syndicated gambling activities, we think it is clear that the Congress may also prohibit conduct which facilitates the operation of illegal gambling businesses.
 
 
 72
 Id. The section analysis of the pending bill also pointed to the special findings, see id. at 4028, while also explaining that the intent of section 1955 was to reach "syndicated operations (which) are so continuous and so substantial as to be of national concern . . . ." Id. at 4029. Nowhere in that section analysis dealing with the chapter on "Racketeer Influenced and Corrupt Organizations," i. e., 18 U.S.C. §§ 1961-68 (all included in Title IX), is there any indication that the specific findings applicable to § 1955 were to be carried over. It is true that the section analysis dealing with the statutory section now under consideration makes no explicit reference to the interstate commerce aspect.[21] Nor does the analysis make such a reference when explicating the definitional part of the chapter.[22] However, the omission of explanatory references to the language of interstate commerce provides no basis for deviating from the explicit language of the statute itself. Cf. Brown, supra, 555 F.2d at 415 n.15.
 
 
 73
 The indictment in this case can be read as alleging that the appellants agreed to conduct the affairs of Fox's casino enterprise through a pattern of racketeering activity. However, this conspiracy would constitute a federal offense only if the "enterprise" engaged in activities which affected interstate commerce. By rejecting the Government's argument that the interstate commerce requirement of § 1955 can be automatically carried over to § 1962, we are required to reverse all the convictions under that count.
 
 
 74
 Our disposition of this count should not be misinterpreted. We are not saying that a gambling "enterprise" such as Fox's has no effect upon interstate commerce. Such an assertion would plainly contravene Congressional findings. We merely state that the prosecution cannot rest upon the Title VIII special findings and definitions to establish the requisite effect on commerce. The Government might have successfully prosecuted the twelve defendants if it had attempted to introduce evidence showing that the "casino operation" affected interstate commerce. Under the approach which has been taken in many reported decisions, only slight evidence would have been required. Here, because of apparent prosecutorial uncertainty about the theory of its case, a matter by now sufficiently explored, the Government made no effort at all to connect the dice and card games to interstate commerce. Although we emphatically disagree with the suggestion that the Federal Strike Force was attempting to create a federal offense from essentially local gambling activity, we must agree that the Government has not proved either substantive or conspiracy charges under § 1962.
 
 VII
 
 75
 The twelve appellants have raised a number of other claims of reversible error. Our examination of these other claims indicates no sufficient reason for prolonging this opinion by a formal statement of our reasons for rejecting these arguments. It suffices to note that the appellants claim reversible error with respect to instructions, the admission of evidence, the denial of severance, improper prosecutorial argument, a double jeopardy violation, a speedy trial violation (withdrawn at oral argument), and improper amendment of the indictment. Some of these challenges, particularly those relating to severance and evidence, are those ordinarily found when multiple defendants are charged variously in the same indictment and are tried jointly. Cf. United States v. Campanale, 518 F.2d 352, 359 (9th Cir. 1975), cert. denied, 423 U.S. 1050, 96 S.Ct. 777, 46 L.Ed.2d 638 (1976).
 
 
 76
 We have considered the various arguments. We do not consider them as possessing sufficient merit as to call for a different result, in any one of the consolidated appeals, from that which we have reached. Accordingly, the convictions of appellants Nerone, Seppi, Bradley, Caples, Jamerson, and Helfer under Count I are affirmed. The convictions of Gentry and the two Hornsteins under Count I are reversed. All convictions under Count II are affirmed. The conviction of Marvin Hornstein under Court III is affirmed. The convictions of Seppi and Nerone under Count VI are reversed. The convictions of all twelve appellants on Count VII are reversed.
 
 
 77
 Under Sumpter v. DeGroote, 552 F.2d 1206 (7th Cir. 1977), there can be no retrial on those counts as to which we have ordered reversal. "Unlike reversals due to procedural errors of law that impair effective presentation of the defendant's case, reversals based on the failure of the prosecution's proof represent the judgment of an appellate court that the defendant was entitled to a directed acquittal at trial." Id. at 1211. The district court is instructed to enter judgments of acquittal upon those counts which have been reversed.
 
 
 78
 Affirmed in part; Reversed in part; Remanded with instructions.
 
 STATUTORY APPENDIX
 18 U.S.C. § 1955 provides:
 
 79
 (a) Whoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined not more than $20,000 or imprisoned not more than five years, or both.
 
 
 80
 (b) As used in this section
 
 
 81
 (1) "illegal gambling business" means a gambling business which
 
 
 82
 (i) is a violation of the law of a State or political subdivision in which it is conducted;
 
 
 83
 (ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and
 
 
 84
 (iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.
 
 
 85
 (2) "gambling" includes but is not limited to pool-selling, bookmaking, maintaining slot machines, roulette wheels or dice tables, and conducting lotteries, policy, bolita or numbers games, or selling chances therein.
 
 
 86
 (3) "State" means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, and any territory or possession of the United States.(c) If five or more persons conduct, finance, manage, supervise, direct, or own all or part of a gambling business and such business operates for two or more successive days, then, for the purpose of obtaining warrants for arrests, interceptions, and other searches and seizures, probable cause that the business receives gross revenue in excess of $2,000 in any single day shall be deemed to have been established.
 
 
 87
 (d) Any property, including money, used in violation of the provisions of this section may be seized and forfeited to the United States. All provisions of law relating to the seizure, summary, and judicial forfeiture procedures, and condemnation of vessels, vehicles, merchandise, and baggage for violation of the customs laws; the disposition of such vessels, vehicles, merchandise, and baggage or the proceeds from such sale; the remission or mitigation of such forfeitures; and the compromise of claims and the award of compensation to informers in respect of such forfeitures shall apply to seizures and forfeitures incurred or alleged to have been incurred under the provisions of this section, insofar as applicable and not inconsistent with such provisions. Such duties as are imposed upon the collector of customs or any other person in respect to the seizure and forfeiture of vessels, vehicles, merchandise, and baggage under the customs laws shall be performed with respect to seizures and forfeitures of property used or intended for use in violation of this section by such officers, agents, or other persons as may be designated for that purpose by the Attorney General.
 
 
 88
 (e) This section shall not apply to any bingo game, lottery, or similar game of chance conducted by an organization exempt from tax under paragraph (3) of subsection (c) of section 501 of the Internal Revenue Code of 1954, as amended, if no part of the gross receipts derived from such activity inures to the benefit of any private shareholder, member, or employee of such organization except as compensation for actual expenses incurred by him in the conduct of such activity.
 
 18 U.S.C. § 894 provides:
 
 89
 (a) Whoever knowingly participates in any way, or conspires to do so, in the use of any extortionate means
 
 
 90
 (1) to collect or attempt to collect any extension of credit, or
 
 
 91
 (2) to punish any person for the nonrepayment thereof, shall be fined not more than $10,000 or imprisoned not more than 20 years, or both.
 
 
 92
 (b) In any prosecution under this section, for the purpose of showing an implicit threat as a means of collection, evidence may be introduced tending to show that one or more extensions of credit by the creditor were, to the knowledge of the person against whom the implicit threat was alleged to have been made, collected or attempted to be collected by extortionate means or that the nonrepayment thereof was punished by extortionate means.
 
 
 93
 (c) In any prosecution under this section, if evidence has been introduced tending to show the existence, at the time the extension of credit in question was made, of the circumstances described in section 892(b)(1) or the circumstances described in section 892(b)(2), and direct evidence of the actual belief of the debtor as to the creditor's collection practices is not available, then for the purpose of showing that words or other means of communication, shown to have been employed as a means of collection, in fact carried an express or implicit threat, the court may in its discretion allow evidence to be introduced tending to show the reputation of the defendant in any community of which the person against whom the alleged threat was made was a member at the time of the collection or attempt at collection.
 
 18 U.S.C. § 111 provides:
 
 94
 Whoever forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any person designated in section 114 of this title while engaged in or on account of the performance of his official duties, shall be fined not more than $5,000 or imprisoned not more than three years, or both.
 
 
 95
 Whoever, in the commission of any such acts uses a deadly or dangerous weapon, shall be fined not more than $10,000 or imprisoned not more than ten years, or both.
 
 18 U.S.C. § 1114 provides:
 
 96
 Whoever kills any judge of the United States, any United States Attorney, any Assistant United States Attorney, or any United States marshal or deputy marshal or person employed to assist such marshal or deputy marshal, any officer or employee of the Federal Bureau of Investigation of the Department of Justice, any officer or employee of the Postal Service, any officer or employee of the secret service or of the Drug Enforcement Administration, any officer or enlisted man of the Coast Guard, any officer or employee of any United States penal or correctional institution, any officer, employee or agent of the customs or the internal revenue or any person assisting him in the execution of his duties, any immigration officer, any officer or employee of the Department of Agriculture or of the Department of the Interior designated by the Secretary of Agriculture or the Secretary of the Interior to enforce any Act of Congress for the protection, preservation, or restoration of game and other wild birds and animals, any employee of the Department of Agriculture designated by the Secretary of Agriculture to carry out any law or regulation, or to perform any function in connection with any Federal or State program or any program of Puerto Rico, Guam, the Virgin Islands of the United States, or the District of Columbia, for the control or eradication or prevention of the introduction or dissemination of animal diseases, any officer or employee of the National Park Service, any officer or employee of, or assigned to duty in, the field service of the Bureau of Land Management, or any officer or employee of the Indian field service of the United States, or any officer or employee of the National Aeronautics and Space Administration directed to guard and protect property of the United States under the administration and control of the National Aeronautics and Space Administration, any security officer of the Department of State or the Foreign Service, or any officer or employee of the Department of Health, Education, and Welfare, or of the Department of Labor, or of the Department of Agriculture assigned to perform investigative, inspection, or law enforcement functions, while engaged in the performance of his official duties, or on account of the performance of his official duties, shall be punished as provided under sections 1111 and 1112 of this title.
 
 18 U.S.C. § 1961 provides:
 As used in this chapter
 
 97
 (1) "Racketeering activity" means (A) any act or threat involving murder, kidnaping, gambling, arson, robbery, bribery, extortion, or dealing in narcotic or other dangerous drugs, which is chargeable under State law and punishable by imprisonment for more than one year; (B) any act which is indictable under any of the following provisions of title 18, United States Code: Section 201 (relating to bribery), section 224 (relating to sports bribery), sections 471, 472 and 473 (relating to counterfeiting), section 659 (relating to theft from interstate shipment) if the act indictable under section 659 is felonious, section 664 (relating to embezzlement from pension and welfare funds), sections 891-894 (relating to extortionate credit transactions), section 1084 (relating to the transmission of gambling information), section 1341 (relating to mail fraud), section 1343 (relating to wire fraud), section 1503 (relating to obstruction of justice), section 1510 (relating to obstruction of criminal investigations), section 1511 (relating to the obstruction of State or local law enforcement), section 1951 (relating to interference with commerce, robbery, or extortion), section 1952 (relating to racketeering), section 1953 (relating to interstate transportation of wagering paraphernalia), section 1954 (relating to unlawful welfare fund payments), section 1955 (relating to the prohibition of illegal gambling businesses), sections 2314 and 2315 (relating to interstate transportation of stolen property), sections 2421-24 (relating to white slave traffic), (C) any act which is indictable under title 29, United States Code, section 186 (dealing with restrictions on payments and loans to labor organizations) or section 501(c) (relating to embezzlement from union funds), or (D) any offense involving bankruptcy fraud, fraud in the sale of securities, or the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in narcotic or other dangerous drugs, punishable under any law of the United States;
 
 
 98
 (2) "State" means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, any territory or possession of the United States, any political subdivision, or any department, agency, or instrumentality thereof;
 
 
 99
 (3) "person" includes any individual or entity capable of holding a legal or beneficial interest in property;
 
 
 100
 (4) "enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity;
 
 
 101
 (5) "pattern of racketeering activity" requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity;
 
 
 102
 (6) "unlawful debt" means a debt (A) incurred or contracted in gambling activity which was in violation of the law of the United States, a State or political subdivision thereof, or which is unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury, and (B) which was incurred in connection with the business of gambling in violation of the law of the United States, a State or political subdivision thereof, or the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate;
 
 
 103
 (7) "racketeering investigator" means any attorney or investigator so designated by the Attorney General and charged with the duty of enforcing or carrying into effect this chapter;
 
 
 104
 (8) "racketeering investigation" means any inquiry conducted by any racketeering investigator for the purpose of ascertaining whether any person has been involved in any violation of this chapter or of any final order, judgment, or decree of any court of the United States, duly entered in any case or proceeding arising under this chapter;
 
 
 105
 (9) "documentary material" includes any book, paper, document, record, recording, or other material; and
 
 
 106
 (10) "Attorney General" includes the Attorney General of the United States, the Deputy Attorney General of the United States, any Assistant Attorney General of the United States, or any employee of the Department of Justice or any employee of any department or agency of the United States so designated by the Attorney General to carry out the powers conferred on the Attorney General by this chapter. Any department or agency so designated may use in investigations authorized by this chapter either the investigative provisions of this chapter or the investigative power of such department or agency otherwise conferred by law.
 
 18 U.S.C. § 1962 provides:
 
 107
 (a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in or the activities of which affect, interstate or foreign commerce. A purchase of securities on the open market for purposes of investment, and without the intention of controlling or participating in the control of the issuer, or of assisting another to do so, shall not be unlawful under this subsection if the securities of the issuer held by the purchaser, the members of his immediate family, and his or their accomplices in any pattern or racketeering activity of the collection of an unlawful debt after such purchase do not amount in the aggregate to one percent of the outstanding securities of any one class, and do not confer, either in law or in fact, the power to elect one or more directors of the issuer.
 
 
 108
 (b) It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.
 
 
 109
 (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.
 
 
 110
 (d) It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section.
 
 Ill.Rev.Stat., ch. 38, § 28-1 provides:
 
 111
 (a) A person commits gambling when he:
 
 
 112
 (1) Plays a game of chance or skill for money or other thing of value, unless excepted in subsection (b) of this Section; or
 
 
 113
 (2) Makes a wager upon the result of any game, contest, or any political nomination, appointment or election; or
 
 
 114
 (3) Operates, keeps, owns, uses, purchases, exhibits, rents, sells, bargains for the sale or lease of, manufactures or distributes any gambling device; or
 
 
 115
 (4) Contracts to have or give himself or another the option to buy or sell, or contracts to buy or sell, at a future time, any grain or other commodity whatsoever, or any stock or security of any company, where it is at the time of making such contract intended by both parties thereto that the contract to buy or sell, or the option, whenever exercised, or the contract resulting therefrom, shall be settled, not by the receipt or delivery of such property, but by the payment only of differences in prices thereof: however, the issuance, purchase, sale, exercise, endorsement or guarantee, by or through a person registered with the Secretary of State pursuant to Section 8 of the Illinois Securities Law of 1953, or by or through a person exempt from such registration under said Section 8, of a put, call, or other option to buy or sell securities which have been registered with the Secretary of State or which are exempt from such registration under Section 3 of the Illinois Securities Law of 1953 is not gambling within the meaning of this paragraph (4); or
 
 
 116
 (5) Knowingly owns or possesses any book, instrument or apparatus by means of which bets or wagers have been, or are, recorded or registered, or knowingly possesses any money which he has received in the course of a bet or wager; or
 
 
 117
 (6) Sells pools upon the result of any game or contest of skill or chance, political nomination, appointment or election; or
 
 
 118
 (7) Sets up or promotes any lottery or sells, offers to sell or transfers any ticket or share for any lottery; or
 
 
 119
 (8) Sets up or promotes any policy game or sells, offers to sell or knowingly possesses or transfers any policy ticket, slip, record, document or other similar device; or
 
 
 120
 (9) Knowingly advertises any lottery or policy game or drafts, prints or publishes any lottery ticket or share, or any policy ticket, slip, record, document or similar device, or any advertisement of any lottery or policy game; or
 
 
 121
 (10) Knowingly transmits information as to wagers, betting odds, or changes in betting odds by telephone, telegraph, radio, semaphore or similar means; or knowingly installs or maintains equipment for the transmission or receipt of such information; except that nothing in this subdivision (10) prohibits transmission or receipt of such information for use in news reporting of sporting events or contests.
 
 
 122
 (b) Participants in any of the following activities shall not be convicted of gambling:
 
 
 123
 (1) Agreements to compensate for loss caused by the happening of chance including without limitation contracts of indemnity or guaranty and life or health or accident insurance; and
 
 
 124
 (2) Offers of prizes, award or compensation to the actual contestants in any bona fide contest for the determination of skill, speed, strength or endurance or to the owners of animals or vehicles entered in such contest; and
 
 
 125
 (3) Pari-mutuel betting as authorized by the law of this State; and
 
 
 126
 (4) Manufacture of gambling devices, including the acquisition of essential parts therefor and the assembly thereof, for transportation in interstate or foreign commerce to any place outside this State when such transportation is not prohibited by any applicable Federal law; and
 
 
 127
 (5) The game commonly known as "bingo", when conducted in accordance with "An Act making lawful the conducting of bingo by certain non-profit organizations, requiring licensing and prescribing regulations therefor; "
 
 
 128
 (6) Lotteries when conducted by the State of Illinois in accordance with the "Illinois Lottery Law", enacted by the 78th General Assembly.
 
 
 129
 (c) Sentence.
 
 
 130
 Gambling under subsection (a)(1) or (a)(2) of this Section is a Class A misdemeanor. Gambling under any of subsections (a)(3) through (a)(10) of this Section is a Class A misdemeanor. A second or subsequent conviction under any of subsections (a)(3) through (a)(10), is a Class 4 felony.
 
 
 131
 (d) Circumstantial evidence.
 
 
 132
 In prosecutions under Subsection 28-1(a)(1) through Subsection 28-1(a)(10), circumstantial evidence shall have the same validity and weight as in any criminal prosecution.
 
 Ill.Rev.Stat. ch. 38, § 28-1.1 provides:
 
 133
 (a) Declaration of Purpose. Recognizing the close relationship between professional gambling and other organized crime, it is declared to be the policy of the legislature to restrain persons from engaging in the business of gambling for profit in this State. This Section shall be liberally construed and administered with a view to carrying out this policy.
 
 
 134
 (b) A person commits syndicated gambling when he operates a "policy game" or engages in the business of bookmaking.
 
 
 135
 (c) A person "operates a policy game" when he knowingly uses any premises or property for the purpose of receiving or knowingly does receive from what is commonly called "policy":
 
 
 136
 (1) money from a person other than the bettor or player whose bets or plays are represented by such money; or
 
 
 137
 (2) written "policy game" records, made or used over any period of time, from a person other than the bettor or player whose bets or plays are represented by such written record.
 
 
 138
 (d) A person engages in bookmaking when he receives or accepts more than five bets or wagers upon the result of any trials or contests of skill, speed or power of endurance or upon any lot, chance, casualty, unknown or contingent even whatsoever, which bets or wagers shall be of such size that the total of the amounts of money paid or promised to be paid to such bookmaker on account thereof shall exceed $2,000. Bookmaking is the receiving or accepting of such bets or wagers regardless of the form or manner in which the bookmaker records them.
 
 
 139
 (e) Participants in any of the following activities shall not be convicted of syndicated gambling:
 
 
 140
 (1) Agreements to compensate for loss caused by the happening of chance including without limitation contracts of indemnity or guaranty and life or health or accident insurance; and
 
 
 141
 (2) Offers of prizes, award or compensation to the actual contestants in any bona fide contest for the determination of skill, speed, strength or endurance or to the owners of animals or vehicles entered in such contest; and
 
 
 142
 (3) Pari-mutuel betting as authorized by laws of this State; and
 
 
 143
 (4) Manufacture of gambling devices, including the acquisition of essential parts therefor and the assembly thereof, for transportation in interstate or foreign commerce to any place outside this State when such transportation is not prohibited by any applicable Federal law.
 
 
 144
 (f) Sentence. Syndicated gambling is a Class 3 felony.
 
 
 
 [1]
 Robert Charles Fox, the proprietor of the gambling business principally involved in these charges, was named as a defendant in each of the seven counts of the indictment. He died prior to trial, however, and the court subsequently entered an order dismissing all counts of the indictment as to him. Fox was the only named defendant in Counts IV and V. The former charged that Fox had stolen a .38 caliber automatic pistol which was the property of the United States, and the latter charged that Fox had advised a grand jury witness to give false testimony
 
 
 [2]
 For the text of this statute and those forming the basis of the other counts in the indictment, see the Appendix infra
 
 
 [3]
 Under such cases as United States v. Brown, 555 F.2d 407, 415-16 (5th Cir. 1977); United States v. Altese, 542 F.2d 104 (2d Cir. 1976), cert. denied sub nom. Napoli v. United States, 429 U.S. 1039, 97 S.Ct. 736, 50 L.Ed.2d 750 (1977); and United States v. Cappetto, 502 F.2d 1351, 1358 (7th Cir. 1974), cert. denied, 420 U.S. 925, 95 S.Ct. 1121, 43 L.Ed.2d 395 (1975), Count VII could be read as charging that the casino gambling operation which Fox operated in the basement of his modular home was the "enterprise" whose affairs the appellants had conspired to conduct through a pattern of racketeering activity. This reading of Count VII, in our opinion, is the more natural
 
 
 [4]
 Thus, after having first set out the definition of gambling contained in § 1955, the trial judge charged the jury as follows:
 The words "substantially continuous operation" should also be given their normal and customary meaning. What constitutes "substantially continuous operation" is a question for you to decide.
 
 
 [5]
 The transcript reveals this colloquy:
 Q. Did you see the defendant or anybody guarding the door area?
 A. Yes, Mr. Mercer was at the front door and Mr. Gentry was in the bar area, and that night he let two people in through the back door or in a door. He had to take the two-by-four off of it to let them in and put the two-by-four back on. (Emphasis added.)
 
 
 [6]
 Donald Hornstein stated to FBI agents that he had been in the gambling business with his brother. Marvin Hornstein contends that this admission went to a material element of Count I, i. e., that Marvin maintained an illegal gambling business in conjunction with other defendants and thus was one of the persons to be included in the five defendants required to sustain federal jurisdiction. Because independent evidence established that more than five persons were participants in the Fox casino operation, we see no prejudice on the jurisdictional element. However, the paucity of evidence showing a connection between the Hornsteins and Robert Fox may have been augmented by the post-conspiracy, hearsay statement. In view of our disposition of the Hornsteins' convictions on Count I, we deem it unnecessary to review the exercise of discretion which led the trial judge to admit Donald Hornstein's post-conspiracy statement. We note at this point that Marvin Hornstein's challenge to the post-conspiracy statements of Larron Shellinger and Arthur Gentry requires separate consideration
 
 
 [7]
 The brief of appellant Vieth summarizes quite succinctly the common argument:
 It is clear from the record as a whole that Fox had no interest in collecting the debt, and that the fracas and subsequent violence was caused by remarks regarding the Attorney General but mostly by guns on the persons of Salmieri and Nance.
 
 
 [8]
 "However, statements of any conspirator which are not in furtherance of the conspiracy or made before its existence or after its termination, may be considered as evidence only against the person making them." (Emphasis added.)
 
 
 [9]
 Appellant Hornstein asks this court to reexamine its position in United States v. Slaton, 430 F.2d 1109 (7th Cir. 1970), and to adopt the reasoning of the dissent. In view of Hornstein's explicit concession that the trial judge did inform the defendants of the court's proposed instructions prior to closing arguments, we have difficulty in discerning his reliance on the Slaton dissent. Judge Doyle's dissent was predicated on the "explicit, flat, and wholesome" requirement of Rule 30 that the court inform counsel of its proposed action. Id. at 1112
 
 
 [10]
 Fed.R.Crim.P. 30, in pertinent part, provides:
 No party may assign as error any portion of the charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection. Opportunity shall be given to make the objection out of the hearing of the jury and, on request of any party, out of the presence of the jury.
 
 
 [11]
 The Court's Instruction No. 31 read as follows:
 It is charged in Count III of the indictment that on or about February 13, 1975, in the Southern District of Illinois, the defendant, Marvin Hornstein did forcibly assault Stephen A. Salmieri, an officer of the Federal Bureau of Investigation of the United States Department of Justice, while said Stephen A. Salmieri was engaged in the performance of official duties as an officer of the Federal Bureau of Investigation; and it is further charged that, in the commission of such assault, the defendant used a deadly and dangerous weapon, namely: a .38 caliber Super Automatic; in violation of Title 18, Section 111, of the United States Code.
 The actual charge in the indictment was a bit different. It stated:
 The June, 1975 Grand Jury further charges:
 That on or about the thirteenth day of February, 1975, in the Southern District of Illinois, ROBERT CHARLES FOX MARVIN MARTIN HORNSTEIN, a/k/a "Pete", the defendants herein willfully did forcibly and with the use of a dangerous and deadly weapon assault, resist, oppose, impede, intimidate and interfere with Stephen A. Salmieri, a Special Agent of the Federal Bureau of Investigation of the Department of Justice, while the said Stephen A. Salmieri was engaged in the performance of his official duties
 In violation of Sections 111, 1114, and 2, Title 18 United States Code.
 
 
 [12]
 The Court's Instruction No. 35 read:
 As previously mentioned, an act is done "wilfully" if done voluntarily and intentionally, and with the specific intent to do something the law forbids; that is to say, with bad purpose either to disobey or to disregard the law.
 
 
 [13]
 The court modified the instruction by substituting the word "asserted" for "reasonable." As modified, Hornstein's No. 8 (Court's Instruction No. 39) stated:
 While knowledge of the identity or official character of the person assaulted is not, in and of itself, an element of the offense of assault of a Federal officer, you may consider the defendant's lack of knowledge of the identity or official character of the person assaulted on the issue of defendant's asserted (reasonable) belief in the use of force to protect himself, Robert Fox and others at the time of the occurrence.
 
 
 [14]
 We do note that the Second Circuit reached the same result in Altese, supra, 542 F.2d at 107, as this circuit reached in Cappetto. In so doing, the Altese majority apparently rejected the dissent's suggestion, id. at 110, that the Cappetto opinion was "unable to withstand careful scrutiny." The Altese majority, it is true, purports only to follow the Cappetto "result," not its rationale
 
 
 [15]
 Thus, at oral argument, after members of this panel inquired as to how the operation of the casino impacted on the Maple Manor corporation, the Government responded with assertions, but not with record references to testimony or evidence, that Maple Manor was "a merged enterprise . . . a front for the gambling operation . . . infiltrated by the racketeering element."
 
 
 [16]
 Section 801 of the Act read as follows:
 The Congress finds that illegal gambling involves widespread use of, and has an effect upon, interstate commerce and the facilities thereof.
 As this court observed in Hunter, supra at 1021, these special findings were made "(w)ith respect to Title VIII dealing with syndicated gambling . . . ."
 
 
 [17]
 References herein to Title VIII for the purposes of this opinion are to § 1955 and to Title IX are to § 1962
 
 
 [18]
 18 U.S.C. § 1961(4) provides:
 As used in this chapter (ch. 96)
 (4) "enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.
 
 
 [19]
 18 U.S.C. § 1955(b) provides:
 As used in this section
 (1) "illegal gambling business" means a gambling business which
 (i) is a violation of the law of a State or political subdivision in which it is conducted;
 (ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or a part of such business; and
 (iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.
 
 
 [20]
 Of course, like the Supreme Court in Perez, supra, 402 U.S. at 156, 91 S.Ct. at 1362, we do not state that "Congress need make particularized findings in order to legislate." The real problem in this case, as the last paragraph of this part of the opinion explains, is that there is not only an absence of special legislative findings but also the prosecution's total failure to introduce evidence regarding the effect of the casino operation on interstate operation
 
 
 [21]
 "Subsection (c) prohibits the conduct of the enterprise through the prohibited pattern of activity or collection of debt. Again, the prohibition is without exception." Id. at 4033
 
 
 [22]
 "Subsection (4) (of § 1961) defines 'enterprise' to include associations in fact, as well as legally recognized associative entities. Thus, infiltration of any associative group by any individual or group capable of holding a property interest can be reached." Id. at 4032