UNITED STATES of America

v.

Joseph S. SWIDERSKI, a/k/a Joe Winters, Appellant.

UNITED STATES of America

v.

David A. McGOWAN, a/k/a Shaggs, Appellant.

Nos. 78–1046, 78–1047.

United States Court of Appeals, District of Columbia Circuit.

Dec. 26, 1978.

Rehearing Denied Jan. 19, 1979.
Certiorari Denied April 30, 1979.
See 99 S.Ct. 2055, 2056.

Fred R. Joseph, Hyattsville, Md. (appointed by this Court), for appellant in No. 78–1047.

Harvey Yale Smith, Washington, D. C. (appointed by this Court), for appellant in No. 78–1046.

John W. Polk, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., John A. Terry, Michael W. Farrell and Barry L. Leibowitz, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee.

Before McGOWAN and ROBB, Circuit Judges, and JONES,* United States Senior District Judge for the District of Columbia.

Opinion for the court filed by Senior District Judge WILLIAM B. JONES.

WILLIAM B. JONES, Senior District Judge:

Appellants Swiderski and McGowan in District Court Criminal Case No. 77–0259 waived trial by jury and were tried by District Judge Pratt. At the conclusion of

* Sitting by designation pursuant to 28 U.S.C. § 294(e).

the trial, Judge Pratt made 47 detailed findings of fact, each amply supported by the record, and found Swiderski guilty of Count 1 (racketeering influenced and corrupt organizations), Counts 2 (conspiracy), 4, 6, 8, 9 and 10 (unlawfully, knowingly and intentionally distributing a quantity of cocaine), Counts 3, 5 and 7 (interstate and foreign travel or transportation in aid of racketeering enterprises). McGowan was found guilty of Count 1 (racketeering influenced and corrupt organizations), Count 2 (conspiracy), and Count 11 (unlawful possession with intent to distribute controlled substance). Each appellant was sentenced by Judge Pratt to a substantial term of incarceration.

Each appellant appealed, seeking to overturn his conviction, and each made a number of contentions in an effort to accomplish that purpose. The several contentions have been considered and all found to be without merit. Only one merits any comment.

McGowan has asserted that he could not have been guilty of the Racketeer Influenced and Corrupt Organizations statute—popularly known as RICO—18 U.S.C. Sec. 1962. He contends that statute violates due process in failing to define the nature and extent of the acts proscribed and that there is insufficient evidence to show that the affairs of Sylvester's Restaurant were conducted through a pattern of racketeering or that McGowan participated in the conduct of the restaurant's affairs.

18 U.S.C. Sec. 1962, declares it to be unlawful "(c) * * * for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity * * *." "Racketeering activity" has been defined as including "the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in narcotics or other dangerous drugs punishable under any law of the United States." 18 U.S.C. Sec. 1961(1). Cocaine has been classified as a dangerous drug, punishable under the laws of the United States. 21 U.S.C. Secs. 812(c), Schedule II(a)(4), 841.

McGowan's activities included his buying and selling cocaine.

At the time of the offenses alleged in the indictment, Framoco, Inc. was a corporation trading as Sylvester's Restaurant, located at 1129–21st Street, N.W., Washington, District of Columbia. All of the stock of the corporation was owned by Swiderski. In a room on the third floor of the building housing the restaurant, Swiderski maintained the corporate records. It was in this room over a period of several months that narcotics traffic was carried on. On November 10, 1976, Donald R. Donato and Howard Kolbenheyer, by prearrangement with Swiderski, travelled from New York City to the District of Columbia. They were transporting cocaine. After arrival in the District of Columbia, they met Swiderski at Sylvester's Restaurant. Swiderski took them to the third floor room where they showed Swiderski the cocaine they were carrying. The cocaine at that time was in four 1-ounce packages. After Kolbenheyer and Donato had lunch at the restaurant with Swiderski, Swiderski telephoned George Kenney and made arrangements for Kenney to meet with Swiderski, Donato and Kolbenheyer, at the home of Al Glass, Kenney's brother-in-law, in Virginia. On leaving the restaurant, Swiderski, Donato and Kolbenheyer met McGowan. McGowan in his automobile drove Swiderski, Donato and Kolbenheyer to Al Glass' home in Virginia. At Glass' home McGowan expressed the desire to purchase ½ ounce of cocaine. Because there was no scale in Glass' house, Swiderski, Donato, Kolbenheyer and Kenney were driven by McGowan in the latter's automobile to Kenney's house. There McGowan and Kenney each purchased ½ ounce of cocaine. From Kenney's house, McGowan drove Kolbenheyer, Donato and Swiderski to the Fun and Fitness Health Spa in Virginia. On arrival at the spa, all four went into the building. There McGowan waited in the room adjacent to a toilet room, where a sale of an ounce of

cocaine was made to Wayne Pierce and William Marseglia, two employees of the spa.

After the sale to Pierce and Marseglia, McGowan drove Swiderski, Donato and Kolbenheyer back to Sylvester's Restaurant, where a third 1-ounce package of cocaine was sold to Kathy Fisher, an employee of Sylvester's Restaurant. This sale took place in the third floor room where the cocaine had first been shown to Swiderski. Present at that time were Donato, Swiderski and Kolbenheyer. During the trip in McGowan's car, both McGowan and Swiderski made inquiries of Donato and Kolbenheyer as to whether they could purchase a pound of cocaine. Both seemed to have the same purchaser in mind. Marilyn Fisher, a sister of Kathy Fisher, on one occasion purchased a gram of cocaine from McGowan on the second floor of the building housing Sylvester's Restaurant. At that time Marilyn Fisher recalled seeing at least two or three other small packages of cocaine with the one gram package she purchased from McGowan. This transaction took place in the winter of 1976.

Another trafficker in cocaine was Eugene Cintron. He had been bringing cocaine from New York to Washington for delivery to Swiderski during the time Swiderski was employed with another restaurant in Washington and he continued to bring cocaine after Swiderski opened Sylvester's Restaurant in the winter of 1975. He made such deliveries as often as twice a week until June of 1976. In the meantime, Swiderski and Cintron had a falling out over the cocaine. In May of 1976, McGowan helped Cintron sell some cocaine. On other occasions, McGowan had consumed cocaine in the third floor room; in some cases he had the cocaine himself and on other occasions there were others who produced the cocaine used by him.

During this whole period, a special agent, William J. Logay, of the Drug Enforcement Administration, was working under cover and using the name of Bill Lorenzo. On one occasion, Logay, at the bar of Sylvester's Restaurant on the first floor, expressed with some feeling his dissatisfaction with the cocaine he had purchased. The cocaine about which Logay complained had been purchased by him on January 6, 1977, from Swiderski. McGowan too had purchased cocaine on January 6 and was dissatisfied with it and he so advised Logay. McGowan on January 12, 1977, talked to Logay on the telephone and told him that Swiderski wanted to have a meeting at the restaurant. The meeting took place on January 13, 1977, in the evening. At that meeting, Swiderski voiced the opinion to Logay that he should not have complained downstairs at the bar as he did about the cocaine. McGowan on that same date complained to Swiderski about the cocaine McGowan had bought.

■ From the foregoing summary of the evidence concerning McGowan, it is clear that he knew that at and in Sylvester's Restaurant trafficking in cocaine was being carried on and in fact he was participating in such trafficking. Furthermore, he knew that Sylvester's Restaurant was not only engaged in the food business, but was also being used as a cover or front for the illegal trafficking of cocaine.

The statute defines an enterprise as including "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact though not a legal entity." 18 U.S.C., Sec. 1961(4). That definition supports a reading of "enterprise" as including both the legitimate and illegitimate aspects of Sylvester's. Sylvester's as an eating establishment was also a "front" for the illegal activity of trafficking in cocaine. In construing the statute, it is to be noted that Congress specifically provided that it "shall be liberally construed to effectuate its remedial purposes." Sec. 904, Pub.L. 91–452. In *U. S. v. Stofsky,* 409 F.Supp. 609 (S.D.N.Y.1973), *aff'd* 527 F.2d 237, (2d Cir. 1975), the court viewed the broad definition of "enterprise" as accomplishing Congress' purpose to include the many forms an enterprise can take. There it was stated:

The perversion of legitimate business may take many forms. The goals of the

enterprise may themselves be perverted. Or the legitimate goals may be continued as a front for unrelated criminal activity. . . . No good reason suggests itself as to why Congress should want to cover some, but not all of these forms . . . (409 F.Supp. at 613.)

And the Second Circuit in *U. S. v. Altese,* 542 F.2d 104 (2d Cir. 1976), specifically held that illegitimate business activities are covered by the statute as well as legitimate organizations. There it was emphasized that the statute sanctions "any" enterprise engaged in racketeering activities. There was no limiting language.

■ As an owner of all the stock of the corporation operating Sylvester's, Swiderski was obviously "employed by or associated with" the restaurant. And from the facts above recited, McGowan is found to be "associated with" the enterprise since he engaged "directly or indirectly in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. Sec. 1962(c). The statute defines "a pattern of racketeering activity" as requiring "at least two acts of racketeering" such as drug dealing. 18 U.S.C. Sec. 1961(5). This requirement that each defendant be guilty of two acts of racketeering activity rebuts appellant McGowan's argument that a "status" crime is involved, and/or that the statute is unconstitutionally vague. As explained by the court in *U. S. v. Elliott,* 571 F.2d 880 (5th Cir. 1978), at 902, 903:

The gravamen of the conspiracy charge in this case is not that each defendant agreed to commit arson . . . ; rather, it is that each agreed to participate, directly or indirectly, in the affairs of the enterprise by committing two or more predicate crimes. . . . Thus, the RICO net is woven tightly to trap even the smallest fish, those peripherally involved with the enterprise. This effect is enhanced by principles of conspiracy law also developed to facilitate prosecution of conspirators at all levels.

\*  \*  \*  \*  \*  \*

To be convicted as a member of an enterprise conspiracy, an individual, by his words or actions, must have objectively manifested an agreement to participate, directly or indirectly, in the affairs of an enterprise *through the commission of two or more predicate crimes.* (Emphasis in text)

The basic constitutional inquiry in this case is whether RICO is too vague to put persons on notice that their activities are illegal and, alternately, casts too large a net and "captures" innocent actors in an enterprise.

Several courts have validated RICO as not being unconstitutionally vague. *See, e. g., U. S. v. Campanale,* 518 F.2d 352, 363–365 (9th Cir. 1975); *U. S. v. Stofsky,* 409 F.Supp. 609, 612–614 (S.D.N.Y.1973); *U. S. v. Elliott,* 571 F.2d 880, 903–905 (5th Cir. 1978). The *Elliott* case presents the most persuasive reasoning for finding RICO constitutional in the present case. *Elliott* emphasized that an individual's complicity under RICO stems from his own acts of racketeering activity (the two required predicate acts), when those acts are completed in association with others. Thus there is no more of a "notice" problem of possible criminal liability than under a more conventional conspiracy statute. The shifting definition of "enterprise" was validated by the courts cited above as necessary in view of the fluid nature of criminal associations.

The possible overbreadth of RICO is not really an issue in this case. RICO may impermissibly reach "small fry" with only a tangential relationship with a criminal enterprise, but in this case neither McGowan nor Swiderski are small fry. Both had significant contacts with the broadly-defined enterprise.

These contentions of McGowan's are without merit.

The judgments of the District Court are in all respects affirmed.