**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Harry ALEMAN and Leonard Foresta, Defendants-Appellants.**

Nos. 78–1782, 78–1783.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 27, 1979.

Decided Oct. 30, 1979.

Donald R. Harris, Jenner & Block, Julius Lucius Echeles, Chicago, Ill., for defendants-appellants.

Thomas P. Sullivan, U. S. Atty., Barry R. Elden, Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellee.

Before SWYGERT, BAUER, and WOOD, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

The basic issue in this case is the applicability of the Racketeer Influenced and Corrupt Organizations Act (RICO)[1] to criminal activities which do not constitute the infiltration by organized crime of legitimate business. Defendants deny that the Act can be applied to a series of burglaries committed in two states by defendants who are not shown to be members of "organized crime" but also argue, in the alternative, that if the Act is applicable to these particular circumstances, then it should be declared unconstitutional as being vague, a denial of equal protection and as permitting the imposition of cruel and unusual punishment. The other issues relate to severances, alleged trial errors, and sentencing. We resolve all the issues against defendants.

Defendants Aleman and Foresta were charged in a nine count indictment with two violations of RICO by reason of a pattern of racketeering activity involving the commission of three home robberies in Illinois and Indiana. The additional counts alleged the transportation of stolen goods from an Indiana robbery in interstate commerce, and the transportation and possession of firearms. In a jury trial Aleman

was found guilty on one count of conspiracy to violate the Act (18 U.S.C. § 1962(d)) (Count I), one count charging a substantive violation of the Act (18 U.S.C. § 1962(c)) (Count II),[2] and one count of transporting stolen goods in interstate commerce (18 U.S.C. § 2314) (Count III).[3] Aleman was found not guilty on two firearms counts (Counts V and VII). Foresta was found guilty of the same RICO violations and Count III, and in addition guilty of the particular firearms violations applicable to him (Counts IV, VI, VIII, and IX).[4]

## THE FACTS

Some examination of the evidence is necessary. The government's case was based to a large extent on the testimony of Louis Almeida, concededly a professional criminal, who was named in the indictment as an unindicted co-conspirator. His testimony was supplemented by testimony of the home invasion victims. Three robberies were involved.

The first robbery occurred on September 16, 1972, at the home of Mrs. Barbara LaPapa in Oak Lawn, Illinois, following a meeting at the Survivor's Club in Chicago between Aleman, Foresta, Almeida, and two others, not involved in this appeal. It was believed by them that Mrs. LaPapa had a large amount of cash in her home which they planned to steal and divide. Foresta and Almeida were selected to actually perform the robbery. Aleman provided the keys to a stolen car for their use and the address of the target home. At the home Foresta threatened Mrs. LaPapa by press-

1. Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968 (1976).

2. The pertinent RICO statutory sections are as follows:
18 U.S.C. § 1962(c) provides:
(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(d) provides:
(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section.

3. Aleman was sentenced to imprisonment for two concurrent terms of 20 years and one consecutive 10-year term for a total of 30 years.

4. Foresta was sentenced to imprisonment for concurrent terms of 20 years and a consecutive term of 10 years for a total of 30 years together with additional concurrent terms of 10 years and 2 years.

ing the barrel of his gun against her stomach and then with help from Almeida tied her up on the floor. A 14-year old baby sitter for Mrs. LaPapa's infant child was also tied up. After about 30 minutes spent in searching the house and collecting cash and jewelry, Foresta and Almeida left leaving the victims tied. They returned with the loot to the club where the others waited. Aleman paid Foresta and Almeida each $500 for their burglary services.

The second burglary did not occur until January 1973, although the defendants and Almeida continued to associate with each other. The genesis of this robbery also took place at the club. The target was a doctor's home in Indianapolis where defendants believed a large amount of cash was kept. Foresta and Almeida were again selected to actually undertake the robbery. Aleman supplied the information about the target home along with a sheriff's badge to be used as a ruse to gain entry. Aleman advised that weapons be carried. Proceeding to Indianapolis, Foresta and Almeida first went to the residence of Leo Miroff, a friend of Aleman's, as they had been instructed to do by Aleman. Miroff and his girl friend, Jane Powers, were present. Miroff, assuring Foresta and Almeida about the amount of cash, showed them the doctor's home. Later Foresta and Almeida went to the doctor's home and, using the sheriff's badge, pushed their way in past the maid, the only person present. She was threatened with a gun and then tied up. After about an hour Foresta and Almeida left with jewelry, furs, and cash, of a total value of about $35,000, and with the maid's car which was later abandoned. Rejoining Miroff and Powers, all four drove with the fruits of the robbery to the home of Aleman in Chicago. Again Aleman paid Foresta and Almeida each $500 for their burglary services. Miroff, at Aleman's direction, was to sell the stolen goods piecemeal rather than in bulk. In the meantime Miroff and Powers became house guests of a friend, Robert Harder, in the Chicago area where they stored the Indianapolis loot while attempting to dispose of it. Miroff chose one prospective customer, but it was a bad choice. The customer was an undercover agent of the Federal Bureau of Narcotics and Dangerous Drugs. As a result, most of the loot was recovered in connection with arrests at the friend's house. Also seized was a small book with names and telephone numbers which is involved in one of the trial issues.

The third robbery followed in November 1973 after additional contacts between the parties at the club and a pre-robbery planning session. This time the target was a north side Chicago home where information led them to believe they would find a large quantity of gold coins. Aleman, Almeida, Foresta, and another man directly participated in this robbery. Again using the sheriff's badge, Foresta and Almeida entered the home and struck the owner in the head with a gun. When he fell, they tied him. His wife was also tied. All four of the robbers searched and ransacked the house for almost an hour and left with about $6,500 worth of various items, but no gold coins.

The defendants did not testify, and relied in their defense primarily on efforts to impeach Almeida and in discrediting eyewitness identifications.

### APPLICATION OF RICO

■ Based on those facts, the indictment charged in part:

> [B]eing persons associated with an enterprise engaged in and the activities of which affected interstate commerce, to wit, a group of individuals associated in fact to plan and commit robberies, to carry away stolen goods and to divide among themselves the stolen goods and all proceeds derived therefrom, unlawfully, wilfully and knowingly did conduct and participate, directly and indirectly in the conduct of such enterprise's affairs through a pattern of racketeering activity, to wit, the commission of robberies in Chicago, Illinois, Oak Lawn, Illinois and Indianapolis, Indiana.

Defendants claim that their alleged criminal conduct does not violate either § 1962(c)

or § 1962(d). To support their view they point out numerous congressional quotations from Reports of the Senate[5] and House[6] suggesting a legislative intention that § 1962 was to apply only to the infiltration by organized crime of legitimate organizations. However, nothing is found in the legislative history, even if we assume that some ambiguity in the Act requires that it be examined, to suggest that the broad wording of the statute is strictly limited to organized crime activities where legitimate business is involved, and may not be used under its broad language to also curb other criminal activities when the acts are part of an illegal enterprise. In addition to the quotations from various Congressmen, defendants cite a law review article written by the late Senator John L. McClellan, one of the sponsors of The Organized Crime Control Act, which encompasses § 1962. "Title IX [§§ 1961–1968]," the Senator wrote, "is aimed at removing organized crime from our legitimate organizations." McClellan, *The Organized Crime Act (S. 30) Or Its Critics: Which Threatens Civil Liberties?*, 46 Notre Dame Law. 55, 141 (1970). But that one sentence is not all the Senator said about the purposes of Title IX. A few pages later the Senator, in answer to criticisms that the statutory list of crimes of which robbery is a part was too inclusive and included offenses often committed by persons not engaged in organized crime, further explained:

> The Senate report does not claim, however, that the listed offenses are committed *primarily* by members of organized crime, only that those offenses are characteristic of organized crime. The listed offenses lend themselves to organized commercial exploitation, unlike some other offenses such as rape, and experience has shown they are commonly committed by participants in organized crime. That is all the title IX list of offenses purports to be, that is all the Senate report claims it to be, and that is all it should be.

*Id.* at 142–43. (Emphasis by the Senator). Then on the next page the Senator further explains Title IX of the Act:

> It is self-defeating to attempt to exclude from any list of offenses such as that found in title IX all offenses which commonly are committed by persons not involved in organized crime. Title IX's list does all that can be expected, as does the list found in the electronic surveillance provisions of title III of the 1968 Safe Streets Act—it lists offenses committed by organized crime with substantial frequency, as part of its commercial operations. The danger that commission of such offenses by other individuals would subject them to proceedings under title IX is even smaller than any such danger under title III of the 1968 act, since commission of a crime listed under title IX provides only one element of title IX's prohibitions. Unless an individual not only commits such a crime but engages in a pattern of such violations, and uses that pattern to obtain or operate an interest in an interstate business, he is not made subject to proceedings under title IX.

*Id.* at 144.

The clear implication is that it is realized that the Act is not restricted to members of organized crime, but can be used to reach out for others if the statutory conditions are met.

 The prohibitions of 18 U.S.C. § 1962(c) apply to "any person" and "any enterprise." Although the stated purpose of the Organized Crime Act, of which RICO is a part, is to eradicate organized crime, the statute itself does not require proof that the defendant or the enterprise are connected with organized crime. In § 3503(a) of Title VI of the Organized Crime Control Act, Congress demonstrated it knew how to limit a provision to "a person who is believed to have participated in an organized criminal activity" if that

---

**5.** Senate Committee on the Judiciary, Report on Organized Crime Control Act of 1969, S.Rep.No.91–617, 91st Cong., 1st Sess. (1969).

**6.** H.R.Rep.No.91–1549, 91st Cong., 2d Sess., *reprinted in* [1970] U.S.Code Cong. & Admin. News, pp. 4007, 4033.

was what was intended. 18 U.S.C. § 3503(a). The statute defines "person" merely as including "any individual or entity capable of holding a legal or beneficial interest in property."[7] "Enterprise" is defined as including "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity . . . ."[8] Our interpretation of RICO is not novel. In *United States v. Campanale*, 518 F.2d 352, 363 (9th Cir. 1975), *cert. denied*, 423 U.S. 1050, 96 S.Ct. 777, 46 L.Ed.2d 638 (1976), the court notes that although Congress "focused on some of the kinds of activities by which individuals and associations engaged in organized crime maintained their income or influence," § 1962 "makes unlawful such activities no matter who engages" in them. Although there need be no allegation of organized crime, there is the requirement that a "pattern of racketeering" be alleged and proven. It was. Racketeering activity as defined in the statute includes the state crime of robbery.[9] A pattern may be established by showing only two acts of racketeering activity.[10]

 Defendants argue that § 1962 is not applicable to an illegal enterprise, but only to an infiltrated legitimate business. In support of their positions, defendants first cite *Church of the Holy Trinity v. United States,*, 143 U.S. 457, 12 S.Ct. 511, 36 L.Ed. 226 (1892), for the view that general statutory language directed toward a particular evil should not be read to unexpectedly encompass other evils. However, the Court qualified that statement. The statute, it said, should not be read so broadly so as to reach "acts which the whole history and life of the country affirm could not have been intentionally legislated against." 143 U.S. at 472, 12 S.Ct. at 516. Home invasion does not qualify as such an act.

But, defendant argues even if Congress may not have intended to limit § 1962 to infiltration of legitimate business, any uncertainty should be resolved in favor of defendants. *Rewis v. United States*, 401 U.S. 808, 91 S.Ct. 1056, 28 L.Ed.2d 493 (1971); *United States v. Campos-Serrano*, 404 U.S. 293, 92 S.Ct. 471, 30 L.Ed.2d 457 (1971). In *Rewis* the Court reaffirmed that ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity. In that case, however, along with other considerations, the statutory language under consideration was given its ordinary meaning which limited the act's ambit. 401 U.S. at 811, 91 S.Ct. 1056. In *Campos-Serrano*, while considering whether possession of a counterfeit alien registration card was an act punishable under 18 U.S.C. § 1546, the Court repeated the long settled general rule that penal statutes are to be strictly construed. 404 U.S. at 297, 92 S.Ct. 471. RICO statutory language, however, was not being interpreted.

 We previously touched on this problem in *United States v. Cappetto,* 502 F.2d 1351 (7th Cir. 1974), *cert. denied*, 420 U.S. 925, 95 S.Ct. 1121, 43 L.Ed.2d 395 (1975), a civil proceeding under § 1962(b), (c), and (d). We held that in addition to a congressional intention to protect legitimate business against infiltration by racketeers, the statute covered other patterns of racketeering activities in or affecting commerce, in that case a gambling business. 502 F.2d at 1358. Later in *United States v. Nerone*, 563 F.2d 836, 850 (7th Cir. 1977), *cert. denied*, 435 U.S. 951, 98 S.Ct. 1577, 55 L.Ed.2d 801 (1978), we recognized our prior holding in *Cappetto*, but *Nerone* was a case in which the government undertook to establish infiltration. Defendant would distinguish those cases on the basis that in each the gambling involved might conceivably be considered as businesses, although illegal, but it is absurd, defendant argues, to consider the activities in the present case as constituting a "home robbery business." However, defendants forthrightly bring to our attention a contrary view expressed in *United States v.*

---

**7.** 18 U.S.C. § 1961(3).

**8.** 18 U.S.C. § 1961(4).

**9.** 18 U.S.C. § 1961(1).

**10.** 18 U.S.C. § 1961(5).

*Elliott,* 571 F.2d 880 (5th Cir. 1978), *cert. denied,* 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978), in which that court held that a group of people who engaged in arson, murder and truck hijackings constituted an "enterprise" under § 1962. That was not a new interpretation of § 1962 by the Fifth Circuit. In *United States v. Hawes,* 529 F.2d 472, 479 (5th Cir. 1976), the court held that the term "enterprise" had a very broad meaning and was not restricted to legitimate business enterprises. The D.C., Second, and Ninth Circuits have expressed similar views. *United States v. Swiderski,* 193 U.S.App.D.C. 92, 593 F.2d 1246 (D.C.Cir.1978), *cert. denied,* 441 U.S. 933, 99 S.Ct. 2055, 2056, 60 L.Ed.2d 662 (1979); *United States v. Altese,* 542 F.2d 104 (2d Cir. 1976), *cert. denied,* 429 U.S. 1039, 97 S.Ct. 736, 50 L.Ed.2d 750 (1977); *United States v. Rone,* 598 F.2d 564 (9th Cir. 1979); *United States v. Campanale,* 518 F.2d 352 (9th Cir. 1975), *cert. denied,* 423 U.S. 1050, 96 S.Ct. 777, 46 L.Ed.2d 638 (1976). Also we have recently held in *United States v. Grzywacz,* 603 F.2d 682 (7th Cir. 1979), Judge Swygert dissenting, that public entities and individuals, in that case a police department, may be considered enterprises for RICO purposes through which racketeering is conducted. Only the Sixth Circuit has held that RICO was restricted in application to legitimate business enterprises. *United States v. Sutton,* 605 F.2d 260 (6th Cir. Sept. 4, 1979). We align ourselves with Judge Engel's view in dissent that RICO is not limited to include only legitimate business. *Id.* at 273.

As the Fifth Circuit explained in *Elliott,* 571 F.2d 880, part of the dispute as to whether RICO includes illegitimate businesses derives from dicta in *Iannelli v. United States,* 420 U.S. 770, 95 S.Ct. 1284, 43 L.Ed.2d 616 (1975). *Elliott,* 571 F.2d at 879 n.17. In *Iannelli* in footnote 19 the Supreme Court commented that RICO

seeks to prevent infiltration of legitimate business by racketeers, but we see no indication in that comment that was intended as a signal that RICO coverage should be given a more limited interpretation than the statute on its face suggests.

In *Elliott,* 571 F.2d at 898, the court analogized the illegal enterprise there under consideration to a large business conglomerate with a chairman of the board overseeing the operations of separate corporate departments. Perhaps such an impressive organization was the ambition of the defendants in the present case. At the time it was closed down, however, at least so far as the evidence reveals, it could only be regarded as a small business. Aleman was the proprietor. The business office was the Survivor's Club. Their investment in equipment was negligible as the cars they used were stolen. The payroll was limited. Perhaps given more time, their business would have successfully grown into a conglomerate at the expense of their victims, but fortunately for the public the defendants were put out of business.

■ The defendants also contend that if § 1962(c) is read to include illegitimate business it should be deemed void for vagueness. That the phrase "any enterprise" is broad in scope, does not mean that because it includes both legitimate and illegitimate enterprises instead of only one or the other that it is therefore vague. As we have noted, "enterprise" is broadly defined by the statute to include among other things a "group of individuals associated in fact although not a legal entity."[11] Being broad in scope is not synonymous with being vague. Our view on this issue is shared by others.[12]

■ The defendants also argue that RICO violates their rights to equal protection because of the discretion permitted the

---

11. 18 U.S.C. § 1961(4).

12. *United States v. Hawes,* 529 F.2d 472, 479 (5th Cir. 1976); *United States v. Campanale,* 518 F.2d 352, 364 (9th Cir. 1975), *cert. denied,* 423 U.S. 1050, 96 S.Ct. 777, 46 L.Ed.2d 638 (1976); *United States v. Cappetto,* 502 F.2d 1351, 1357–58 (7th Cir. 1974), *cert. denied,* 420 U.S. 925, 95 S.Ct. 1121, 43 L.Ed.2d 395 (1975); *United States v. Parness,* 503 F.2d 430, 441–42 (2d Cir. 1974), *cert. denied,* 419 U.S. 1105, 95 S.Ct. 775, 42 L.Ed.2d 801 (1975).

prosecutor to charge a RICO offense or to select only an underlying crime. Prosecutorial discretion does not itself constitute a violation of equal protection unless it is abused for reasons of race, religion or other arbitrary and improper classification which is not claimed to exist in this case. *United States v. Neary*, 552 F.2d 1184, 1195 (7th Cir.), *cert. denied*, 434 U.S. 864, 98 S.Ct. 197, 54 L.Ed.2d 139 (1977). We would expect, however, that government prosecutorial policy will reserve use of this statute for racketeers, leaving local crimes to local authorities. The vagueness argument of defendants is broader than possible abuse of prosecutorial discretion. The statute is vague, defendants claim, because it is impossible to tell which offenses may fall within the ambit of § 1962. Because would-be racketeers may have some alleged difficulty in determining in advance whether their contemplated activities may violate the statute does not mean that the courts must adopt their interpretation of the statute. The statute is clear enough on its face to serve the purposes of both the public and the racketeer. The defendants also argue that unless restricted only to organized crime the statute denies equal protection. We see no denial of equal protection to racketeers who strive to emulate the achievements of their brothers in organized crime.

Finally, defendants claim RICO is repugnant to the Eighth Amendment's ban against cruel and unusual punishment because, as the government views the statute, it may be applied to other than members of organized crime. We find no merit in that contention. Although a RICO offender may be sentenced to a maximum of 20 years the sentence is not mandatory. A § 1962 offender may be sentenced to less than 20 years, fined or given probation. If a defendant qualifies as a racketeer able to accomplish the same illegal goals as organized crime he qualifies for the punishment. The court's sentencing discretion applicable to all offenders alike does not run afoul of the Constitution.

## OTHER ISSUES

The defendants argue that the indictment is multiplicious, charging defendants with the same offense in various counts, because of the interrelationship between Counts I and II and Count III. Count I charged a RICO conspiracy incorporating by reference Count III as one of several overt acts. Count II alleged a substantive RICO offense and likewise incorporated Count III as an additional racketeering act. Count III charged the defendants with the substantive crime of interstate transportation of stolen property. The sentences for each defendant on Count III were made consecutive to the sentences on Counts I and II. In addition, Foresta was convicted by a state court of the same Indiana robbery. Defendants rely primarily on *Prince v. United States*, 352 U.S. 322, 77 S.Ct. 403, 1 L.Ed.2d 370 (1957), in which the Court held that the entry into a bank with intent to rob was not intended as a separate offense under 18 U.S.C. § 2113 from the consummated robbery and therefore the intended crime merged into the completed crime.

We are considering a different statutory scheme. Congress made its intent clear that RICO did not supersede any other law, federal or state, imposing penalties in addition to those provided by RICO.[13] Congress stated its intent was to provide enhanced sanctions.[14] RICO § 1961(5) illustrates this congressional intent. It requires that to constitute an offense that two predicate acts must occur within 10 years, but from that 10 year period is excluded "any period of imprisonment." It is implicit in that provision that even though a defendant has already served time for the first predicate offense that first offense may still be used as an element in establishing a RICO "pattern."

We see no multiplicity, as each count, although related, required in part different proof. Merely incorporating by

---

**13.** Sec. 904(b) of Pub.L. 91–452, 84 Stat. 947 (1970).

**14.** 84 Stat. 923 (1970).

reference a substantive count into a conspiracy count does not constitute multiplicity. *United States v. Bartemio*, 547 F.2d 341, 345 (7th Cir. 1974). The Count I conspiracy is obviously distinct from the Count III charge of interstate transportation of the fruits of the burglary. Count II requiring proof of the conduct of the enterprise's affairs through a pattern of racketeering activity is in contrast to the proof required to sustain Count III, and lacks the necessity of proof of conspiracy.

Defendants also claim that there were three prejudicial trial errors. First, defendants complain about a question asked on cross-examination of George Marcantonio, a defense witness called by Aleman. Marcantonio testified he would not believe Almeida, the government's witness, under oath. Marcantonio claimed to have only the slightest of social relationship with Aleman. The government then asked, "Isn't it correct, Mr. Marcantonio, that you are afraid of Mr. Aleman?" There was a defense objection and a side bar conference at which Aleman's counsel moved for a mistrial which was denied. The trial judge carefully explored the circumstances surrounding the government's question. Government counsel explained that the basis for the question was available government evidence that Marcantonio had been involved in the robbery of an armored truck with Aleman who had viciously beaten up Marcantonio thus causing Marcantonio to fear Aleman. It was explained that Almeida was also the primary witness about that episode and that the government possessed Almeida's written statement. Certain law enforcement officers, the government claimed could supply circumstantial evidence about the affair. Government counsel further explained that not knowing Marcantonio would be called as a witness, he was not prepared at that moment during the side bar conference to say whether or not the government would pursue the matter and offer the evidence to show Marcantonio's bias. Marcantonio, outside the presence of the jury, denied the government's allegations about his relationship with Aleman. The matter was not pursued further

before the jury. The record does not reveal that Marcantonio answered the question before the jury although some counsel believe he did. If he did respond, it appears the answer would have been that he was not afraid of Aleman. Defense counsel failed to follow up their original objection before the jury as they sought no ruling upon it. Nor was there any defense request to strike the question and answer, if there was an answer, or to instruct the jury to disregard it. At the close of all the evidence the defendants did not renew any objection or again move for mistrial after the government had failed to offer evidence in rebuttal regarding Marcantonio's relationship with Aleman.

■ That the possible bias of a witness which may affect credibility is a proper and critical area of exploration by cross-examination is beyond question. Defendants now argue that the error was that the government did not follow the question up with evidence to demonstrate a basis for the question. However, the record suggests that during trial, defense counsel did not want any rebuttal government evidence offered on that issue and had previously sought exclusion of all evidence about fear of Aleman. The government's rebuttal evidence cannot be perceived as being beneficial to Aleman's case. Although at side bar government counsel cautiously mentioned the possibility always existing that the witness when actually called might testify to a different version than recorded in his prior statement, the good faith of the government was not seriously questioned at trial. Defense counsel helped avoid that possible rebuttal evidence damaging to him during trial, but now seeks to have it the other way.

■ In the circumstances of this case, we see no reversible error in the incomplete impeachment. The question was not pursued by the government. The defendants failed to seek available remedies from the trial court to strike the question or give the jury a cautioning instruction. This case is in sharp contrast to those cases in which a

question without any factual basis had been used before a jury merely because of the prejudicial suggestion emanating from the question itself. *United States v. Harris*, 542 F.2d 1283, 1308 (7th Cir. 1976), *cert. denied*, 430 U.S. 934, 97 S.Ct. 1558, 51 L.Ed.2d 779 (1977). In any event this one unanswered question about fear of the defendant put to a witness in an attempt to impeach a government witness could only be lost in many days of trial in which substantial evidence of guns, threats, personal abuse, and home robberies abounded. The possible fear of the witness was not again suggested in any way to the jury. We cannot agree with defendants that the case against Aleman was weak and that therefore the question assumed some unusual critical significance. Sufficiency of the evidence was not an issue on appeal.

■ It is next claimed that it was error to admit into evidence the small book of names and telephone numbers seized by officers at Harder's house in the room occupied by Miroff and Powers as house guests. Inventory lists of the stolen Indianapolis property, partly in the handwriting of Miroff and partly in the handwriting of Powers, were found along with this book. The Indianapolis stolen property was also part of their luggage. Defendants first argue that the foundation laid to permit the book's admission into evidence was inadequate. We believe the book's connections with Miroff were sufficient. A handwriting expert testified that part of the book, though not the relevant part, was in the handwriting of Miroff. On one page of the book three telephone numbers were found next to the name "Harry," circumstantially Aleman. Independent evidence established that two of the numbers were those of a restaurant and a club which Aleman frequented. Telephone company records which went back to 1976 revealed that the third phone number had been registered to a Ruth Aleman on Concord in Melrose Park. There was testimony that defendant Aleman lived on Concord in Melrose Park in 1972 and 1973. The book tended to corroborate the enterprise relationship between Aleman and Miroff testified to by Almeida.

This establishes an adequate foundation to find the evidence relevant. Fed.R.Evid. 401, 402. Any weakness in that regard was a matter of weight not relevancy.

Defendants further contend that the book should not be admitted to corroborate this enterprise relationship because the book is hearsay when used to establish this relationship. We disagree. The relevant listing in the book asserted that "Harry" could be reached at one of three numbers. The listing had value without regard to the veracity of that assertion. The listing was not offered for its truth, but to show Miroff's acquaintance with Aleman. Independent evidence connected Miroff with Aleman based on the book. The book was not relied on to show "Harry's" phone number, only to indicate that Miroff had knowledge of someone named "Harry" at the relevant time. The additional evidence eliminated the hearsay dangers. The book was properly admitted. *McCormick on Evidence* ¶ 249, at 592 (2d ed. 1976); Note, 44 Mich.L.Rev. 480, 481 (1945).

■ Aleman also questions the admission into evidence of the testimony of an investigator for the Chicago Police Department that on a particular occasion he kept Aleman under observation. The officer testified that, about two weeks after the Indianapolis robbery, while having lunch, he saw Harder and his house guests, Miroff and Powers, together in a restaurant. A few minutes later he saw Harder leave that restaurant with Aleman and go to another restaurant where they remained for about an hour. When the officer was asked what he did on that occasion, he replied that he "kept Aleman under observation," and followed him west on a particular street. No objection was made to the question. Defendants claim that the answer engendered prejudicial error because it suggested Aleman was someone the police had reason to surveil. The question and answer cannot constitute plain error. The testimony only completed what the officer had observed on one occasion between the principals. Even had a defense objection been timely made

at trial instead of on appeal, there would have been no error in overruling it.

■ Separate issues are raised as to Foresta by the claim that he was sentenced four times for the same offense. He received a state sentence for the Indianapolis robbery. That same robbery was also a factor in Count I, the conspiracy; Count II, the substantive racketeering violation; and also in Count III, the transportation of the stolen Indiana property. The trial court made no comment about whether the federal sentence would be concurrent or consecutive with the state sentence. Foresta argues that the government should be estopped from bringing the prosecution, or that in the alternative the case should be remanded for resentencing with credit to be allowed for the state sentence. He also complains that federal authorities cooperated with the Indiana prosecutors. We do not see that the Indiana conviction precludes the federal prosecution. There is no double jeopardy. Not only are different sovereignties involved, but the crimes are separate and distinct. The Indianapolis robbery constituted only one of numerous overt acts in the conspiracy charge and one of four racketeering acts alleged in Count II. Count III was not a prosecution for the Indianapolis robbery, but for transporting the loot from that robbery in interstate commerce.

■ The dual sovereignty doctrine of *Abbate v. United States*, 359 U.S. 187, 194, 79 S.Ct. 666, 3 L.Ed.2d 729 (1959), and *Bartkus v. Illinois*, 359 U.S. 121, 79 S.Ct. 676, 3 L.Ed.2d 684 (1959), remains the law; state and federal prosecutions based on the same facts are not constitutionally prohibited. *United States v. Wheeler*, 435 U.S. 313, 316–22, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978). The doctrine simply means that the same single act of a defendant may constitute more than one offense as he may have violated both federal and state laws for which he may be prosecuted. The dual sovereignty doctrine is subject to the qualification, however, that a state prosecution cannot be used merely as a cover and a tool of federal authorities. *Bartkus*, 359 U.S. at 123–24, 79 S.Ct. 676. That an FBI Special Agent testified at Foresta's Indiana trial and a federal prosecutor was listed as a possible state witness does not alone turn the state trial into a sham. Law enforcement cooperation between state and federal authorities is a welcome innovation. Instead of cooperation Foresta views it as federal "orchestration" of state authorities to produce a robbery conviction upon which to develop a RICO indictment. We do not find federal "orchestration" in the record. Indiana authorities were merely performing their own public duty in prosecuting Foresta for burglarizing the home of a local doctor. State authorities need not defer the performance of their own local obligations because of the possibility that the federal authorities might in the future pursue the interstate aspects of the crime.

■ Nor is there any need to return Foresta for resentencing. Under 18 U.S.C. § 3568, a federal sentence commences to run when the defendant is received at a place of confinement for service of the sentence. Under that section the computation of sentence credits is computed by the Attorney General, not the sentencing judge. The sentencing judge has no power to make a federal sentence concurrent with a prior state sentence. Under 18 U.S.C. § 4082, it is the Attorney General who designates the place of confinement. The sentencing judge may only recommend that the Attorney General designate a state institution as a place for service of the federal sentence. If the recommendation is followed, then the state and federal sentences in effect become concurrent. *United States v. Allen*, 588 F.2d 183, 185 (5th Cir. 1979). Such a recommendation is entirely discretionary with the sentencing judge. That there is a factual relationship between the state and federal cases does not require that the trial judge's discretion be exercised in any particular way. No recommendation was made in this case.

Aleman and Foresta also raise a severance issue. Prior to trial Aleman and

Foresta [15] sought severance of Counts VIII and IX which charged Foresta with possessing and transporting a firearm in commerce after having been previously convicted of robbery by assault, a felony, in violation of 18 U.S.C. § 922(g) [16] and 18 U.S.C. app. § 1202(a)(1) [17]. The motion was denied. Foresta's prior felony conviction thus became necessarily an element of the government's proof. Defendants claim the introduction of the admission of evidence of that conviction constituted error, relying on *United States v. Phillips*, 401 F.2d 301 (7th Cir. 1968), and *United States v. Ostrowsky*, 501 F.2d 318 (7th Cir. 1974). In those cases, in which evidence of prior crime was admitted for other purposes, it was a matter of the trial judges' discretion to admit the evidence or to limit its scope. In the present case the prior conviction is an element of the crime. Its admission was not a matter of the trial court's discretion. No details about Foresta's prior robbery by assault were explored. Also, no reference was made during trial before the jury that Foresta's prior conviction of robbery was in fact "robbery by assault." The jury was instructed to give separate consideration to each defendant and to each count. The jury obviously did this as Aleman was acquitted on two firearms charges. The criminal record involved was not Aleman's and he was not shown to have been involved in any way in Foresta's other robbery. The jury was further charged that Foresta's prior conviction should not in any way be considered as proof of the fact that he had committed any of the offenses charged in this indictment. Defendants doubt the effi-

cacy of those limiting instructions. Under our jury system, however, it is fundamental that we reasonably trust juries to make factual determinations in accordance with the court's instructions. *United States v. Pacente*, 503 F.2d 543, 548 (7th Cir.) (en banc), *cert. denied*, 419 U.S. 1048, 95 S.Ct. 623, 42 L.Ed.2d 642 (1974). The circumstances of this case do not suggest that the jury disregarded the court's instructions.

Severance could have avoided that issue, but we find no clear abuse of the trial court's discretion in denying the motion under Rule 14 of the Federal Rules of Criminal Procedure. *United States v. Papia*, 560 F.2d 827, 840 (7th Cir. 1977). Foresta's gun as alleged in Counts VIII and IX was also involved in both Counts I and II. Its transportation was alleged as an overt act in the conspiracy, Count I, and it was evidence of an act of racketeering activity in Count II. There was no necessity in this case to go back over much of the same gun evidence in separate trials. There has been no "strong showing of prejudice" as to either defendant. *United States v. Kopel*, 552 F.2d 1265, 1272 (7th Cir.), *cert. denied*, 434 U.S. 970, 98 S.Ct. 520, 54 L.Ed.2d 459 (1977). Other reviewing courts lend support to our view that severance is unnecessary in somewhat similar circumstances. *United States v. Roe*, 495 F.2d 600, 604 (10th Cir.), *cert. denied*, 419 U.S. 858, 95 S.Ct. 107, 42 L.Ed.2d 92 (1974); *United States v. Lee*, 428 F.2d 917, 920 (6th Cir. 1970), *cert. denied*, 404 U.S. 1017, 92 S.Ct. 679, 30 L.Ed.2d 665 (1972); *United States v. Abshire*, 471 F.2d 116, 118–19 (5th Cir. 1972).

**15.** The government raises some question about the manner in which Foresta moved for severance as at trial he joined in Aleman's motion which was not tailored to his own claims as they appear on appeal, but we need not consider those circumstances.

**16.** The pertinent part of 18 U.S.C. § 922(g) provides as follows:

(g) It shall be unlawful for any person—
(1) . . . who has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year;

\* \* \* \* \* \*

to ship or transport any firearm or ammunition in interstate or foreign commerce.

**17.** The pertinent part of 18 U.S.C. app. § 1202(a) provides as follows:

(a) Any person who—
(1) has been convicted by a court of the United States or of a State or any political subdivision thereof of a felony . . .

\* \* \* \* \* \*

. . . who receives, possesses, or transports in commerce or affecting commerce, after the date of enactment of this Act, any firearm shall be fined not more than $10,000 or imprisoned for not more than two years, or both.

The final issue concerns Aleman's contention that his sentence, a total of 30 years on all counts, was excessive. He claims the record contains no explanation for the sentence imposed. None is required, but some explanation does appear. The reasons for the sentence are apparent and fully justify the exercise of the court's sentencing discretion. We will not interfere. *United States v. Hansen*, 583 F.2d 325, 334 (7th Cir.), *cert. denied*, 439 U.S. 912, 99 S.Ct. 283, 58 L.Ed.2d 259 (1978). The trial judge said he considered home invasions to be a most serious offense. Aleman was shown to be the head of this interstate enterprise of armed home robbery in which victims were threatened and abused. Aleman also had one prior conviction for which he had received probation. To compare sentences in other cases is ordinarily fruitless and it is in this case. Lesser sentences imposed on others in certain other prior cases apparently were inadequate to serve as deterrents to Aleman and Foresta. Nor does Aleman profit by comparing his sentence with the sentence Foresta received. Although Foresta had a serious prior conviction and was convicted on several additional counts, Aleman was the obvious proprietor of their enterprise, now no longer in business.[18]

AFFIRMED.

SWYGERT, Circuit Judge, dissenting.

In *United States v. Grzywacz*, 603 F.2d 682, 690 (7th Cir. 1979), I set forth my basic view on the issue of the extension of the term "enterprise" as used in the Racketeer Influenced and Corrupt Organizations Act (RICO) beyond commercial entities. The same question is before us here and, thus, I see no reason to repeat that view. Additional comment is necessary, however, because the cases involve "enterprises" that are different in nature.

In *Grzywacz* this court was concerned with a city police department, concededly a legitimate entity, albeit not a commercial or business type of organization. Here we are confronted with a so-called "pattern" of criminal activity—the robbing of homes. To urge, as the Government did in *Grzywacz*, that a police department is an "enterprise" within the meaning of the statute, although farfetched and impermissible by any reasonable interpretation of the statute, has some semblance of logic to it. Here, to maintain, as the majority does, that the pattern of criminal activity engaged in by Aleman and his associates is an "enterprise" within the meaning of the statute is to turn logic on its head.

In order to reach the majority's conclusion that such an enterprise exists, we are required to assume that the defendants were infiltrating their own unlawful enterprise through a "pattern of racketeering activity." To my way of thinking, this assumption is absurd. To infiltrate an enterprise, that is, "to conduct or participate . . . in the conduct of such enterprise's affairs [section 1962(c)]," the enterprise must preexist before it is infiltrated by racketeering. Under the facts and the majority's reasoning based on those facts, the enterprise and the racketeering are one and the same. The racketeering defines the enterprise and the enterprise comprises the racketeering.

The majority's faulty reasoning is illustrated by its statement that, "the Act is not restricted to members of organized crime." This misses the point. The point is: What meaning did Congress intend to give to the term "enterprise"? Following the above quoted sentence, the majority then says: "Although the stated purpose of the Organized Crime Act, of which RICO is a part, is to eradicate organized crime, the statute itself does not require proof that the defendant or the enterprise are connected with organized crime." Not only is this statement a non sequitur, but it again misses the point on which the case turns. Even

---

18. In its brief the government brings to our attention that it filed Petition for Dangerous Special Offender Sentencing pursuant to 18 U.S.C. § 3575 and offered to prove that Aleman had participated in five murders in recent years. The petition was denied, and not made part of the record. Those allegations are totally unsupported in the record before us and are therefore totally ignored.

taken as true, it does not relate to the question before us.

I believe that the recent Sixth Circuit opinion in *United States v. Sutton*, 605 F.2d 260 (6th Cir. 1979), correctly decides this very issue. The facts are analogous, and the Government's contentions are the same. Judge Merritt has offered, with admirable clarity, an analysis that is irrefutable.